**AETNA CASUALTY AND SURETY COMPANY, a Connecticut Corporation, et al., Plaintiffs,**

v.

**JEPPESEN & COMPANY, a Colorado Corporation, Defendant.**

**Civ. No. LV–1467–PMH.**

United States District Court, D. Nevada.

Nov. 4, 1977.

---

1. Reversed by Circuit which held the U.S. alone was liable, which entitled the carrier to indemnity.

See also D.C., 440 F.Supp. 391.

Rex A. Jemison, Beckley, Singleton, De-Lanoy & Jemison, Las Vegas, Nev., for plaintiff Aetna Casualty & Surety Co.

Magana, Cathcart & McCarthy, Los Angeles, Cal., for plaintiffs Schulze, Jemison, et al.

Dickerson & Miles, Las Vegas, Nev., Robert J. Popelka, Popelka, Allard, McCowan & Jones, San Jose, Cal., Cromer, Barker & Michaelson, Las Vegas, Nev., for defendant Jeppesen & Co.

## MEMORANDUM AND ORDER ON PLAINTIFFS' MOTION F.R.C.P. 56 [Summary Judgment]

PEIRSON M. HALL, Senior District Judge.

On May 2, 1977, the Court made an Order denying plaintiffs' Motion for Summary Judgment. Counsel then called the Court's attention to the fact that there had been no action by the Court on the defendant's second motion to dismiss the second amended complaint, which motion would, by stipulation, apply to plaintiffs' third amended complaint. Thus, the Order of May 2, 1977 was untimely and the Court vacated it by its Order of July 19, 1977, and, on August 15, 1977, made an Order denying the defendant's second motion to dismiss in part and granting it in part.[1]

In considering that Order it has re-examined the points and authorities of the parties on both the motion to dismiss and the motion for summary judgment, and in light thereof, and of its own research, has now reached the conclusion that it was error for it to make the Order of May 2, 1977 denying the defendant's motion for summary judgment, and is convinced that a different result is required.

## PARTIAL SUMMARY JUDGMENT

While the last sentence of F.R.C.P. 56(c)[2] permits an "interlocutory" judgment on the whole[3] issue of liability alone, "although there is a genuine issue as to the amount of damages," and, while there are no provisions in the F.R.C.P., or 28 U.S.C. § 1291 or § 1292[4] which permit a "partial" summary judgment on the whole issue of liability in a tort case, Subdivision (d) of F.R.C.P. 56 does permit the Court to effectively find what ultimate material facts do exist, and what ultimate "material facts are actually and in good faith controverted" and make an order "specifying the facts that appear without

1. The motion was denied as to cases filed within four years of date of payment by Bonanza, and granted as to the cases where payment was made more than four years prior to the filing of the within suit.

2. F.R.C.P. 56(c) provides by its last sentence, "[a] summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages."

3. While 56(c) does not use the word "whole," that meaning is clear. There is no provision for a "partial" summary judgment of a "partial" issue. *Biggins v. Oltmer*, 7 Cir., 154 F.2d 214.

4. 28 U.S.C. § 1292 permits final appealable orders in receiverships, admiralty and in patent cases but no others, except that an appeal from a non-appealable order may be taken upon the Judge certifying in writing that an immediate appeal will materially advance the ultimate termination of the litigation, if the order involves a controlling question of law. Such a certificate here would not materially advance the litigation. It would, in fact delay it.

substantial controversy, . . .[5] and directing such further proceedings in the action as are just."

There are four ultimate facts necessary to support the "whole" issue of liability in this case.

Succinctly stated, they are:

(1) that Jeppesen produced a faulty approach plate;

(2) that its use by the pilots of Bonanza in approaching Las Vegas for a landing was a proximate cause of the air crash; and

(3) that the pilots were not guilty of any contributory negligence in the use of Jeppesen's landing Chart No. 3;

(4) that Bonanza was not guilty of any contributory negligence.[6]

■ The plaintiffs do not seek a *summary* judgment on the above stated issue of ultimate fact No. 4. And, indeed, they could not because neither the plaintiffs, nor any of them, nor Bonanza, plaintiffs' subrogor, was a party to or participated in any way in the trial resulting in the verdict of liability against Jeppesen in the prior *Schulze-Fitzpatrick-Travis* cases (LV 967 and 969).[7] *Humphrey v. Tann* (6 Cir. 1973) 487 F.2d 666, cert. den. 416 U.S. 956, 94 S.Ct. 1970, 40 L.Ed.2d 307. Neither Bonanza nor its subrogees who take only, but neither more nor less, than the rights of Bonanza, can be bound under the Due Process Clause of the Constitutions of the United States and Nevada.

Furthermore, it is axiomatic that the parties in Cases 967 and 969 could not bind or destroy the rights of Bonanza and its subrogees by an *agreement between themselves* to settle a lawsuit to which neither Bonanza nor any of its subrogees were a party. That agreement redounded to the benefit of the parties in that suit only and cannot impose a burden upon or foreclose the rights of persons not a party to that suit.

The negligence of Bonanza was not tried or in any way put in issue in the trial of LV 967–969. And no conclusion on that ultimate fact is, or is intended, to be expressed in this memorandum.

## HISTORY OF PRIOR LITIGATION

A brief statement of the "bare bones" facts of record leading up to the situation presented here is required before a discussion of the applicable law.

On November 16, 1964 a Bonanza Fairchild plane known as Flight No. 114 enroute from Phoenix to Las Vegas, crashed approximately ten miles from the Las Vegas VORTAC, killing all the passengers, the pilot, the co-pilot, and the stewardess.[8]

When the plane left Phoenix for Las Vegas it was given a flight plan which included a Jeppesen landing chart for Las Vegas. While enroute, the pilots were directed to scratch that landing chart and substitute for it and to use Jeppesen landing chart LV No. 3, which they did. The plane crashed, with the results above indicated.

---

**5.** The omitted language is "including the extent to which the amount of damages or other relief is not in controversy." The amount of damages is not involved in the separated issue of liability. Moreover, the Court has already denied in part and granted in part a motion to dismiss, which limits the provable damages.

**6.** This issue is here because the plaintiffs seek only indemnity. If a Federal rule applies, as later discussed in this Memorandum, then, under the last sentence of F.R.C.P. 54(c), which reads: "Except as to a party against whom a judgment is entered by default, every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled,

*even if the party has not demanded such relief in his pleadings,*" the plaintiffs would be entitled to contribution on a basis ratably to the degree of negligent behavior between Bonanza and Jeppeson—if Bonanza was guilty of contributory negligence.

**7.** The consolidated *Schulze-Fitzpatrick-Travis* cases will hereinafter be referred to as LV 967–969, or the *Schulze* cases.

**8.** The plane was also destroyed, but the plaintiffs concede that the statute of limitations has run for its loss. Thus, we are not further concerned with any damages for loss of the plane in this lawsuit.

Suits were filed by the passengers against Bonanza and the United States.[9] All the passengers' suits were settled and the claims paid by the plaintiffs here who were the insurers of Bonanza. None of those suits included any of the plaintiffs here who are the subrogees of Bonanza.

The heirs of Schulze and Fitzpatrick, the pilots, and Travis, the hostess of the plane, brought suits LV 967 and 969 (hereinafter sometimes called the *Schulze* cases) against Jeppesen based on the principle of products liability, in that it was alleged that the chart which the pilots were instructed to use (and used) in landing was faulty and that the deficiencies in it were either the sole cause of the accident, or a proximate cause of the accident.

In due course, the two cases were consolidated and separated under F.R.C.P. 42(b) for discovery and for trial on the sole issue of liability. They were tried, on that issue only, to a jury which returned a verdict holding against Jeppesen and for the plaintiffs on the issue of liability. The issues given to the jury were defined by the stipulated pretrial order (Appendix A), and by the instructions.

Upon the return of the verdict, the Court indicated that it would proceed forthwith before the same jury on the question of damages. But, at the request of counsel for the defendant Jeppesen, the Court put the trial of damages over for a couple of days so that the parties could arrive at a settlement. They did arrive at a settlement wherein Jeppesen agreed to and did, pay a total of $490,000.00 to the heirs of Schulze, Fitzpatrick and Travis. As part of that settlement, the parties stipulated that the Court would make an Order, the substance of which was that the verdict be withdrawn and stricken as if a new trial had been granted and that the case would be dismissed with prejudice.

Any statement by the Judge in the course of the settlement proceedings in that case

to the effect that there was some negligence on the part of Bonanza is of no binding or evidentiary effect on this case for the reason that *Bonanza was not a party to that case nor were any of its subrogees; nor did they participate in any way: The case was tried solely against Jeppesen, and the verdict was returned solely against Jeppesen.*

## CONTRIBUTION

As indicated in the Order Denying the Motion to Dismiss, contribution, for the purposes of this motion, is not involved in this case. The plaintiffs seek only indemnity, not contribution. In 1973 Nevada added the Uniform Contribution Among Tortfeasors Act by N.R.S. *17.215 to 17.325,* incl. That Act permits contribution ratably, according to the degree of fault, and provides for indemnity if there is no fault. [See, however, discussion in *Kohr* case, post.]

The parties have not briefed whether or not the principles embodied in that Act are but a declaration of existing Nevada law, or were entirely new for Nevada.

## INDEMNITY

The defendants have not raised the issue of a right to recover indemnity. But it must be noted that, as pointed out in the Order Denying the Motion to Dismiss (dated August 12, 1977), the right of plaintiffs to recover arose on the date of payment by plaintiffs or their subrogor Bonanza. All of those payments were made prior to the addition in 1973 of the "Uniform Contribution Among Tortfeasors Act" by Secs. 17.-215 to 17.325, inclusive, of N.R.S. The applicability of the 1973 Act to prior payments, because of the prohibition against *ex-post-facto* law in Art. I, Sec. 15 of the Nevada Constitution is bound up in the question as to whether or not the 1973 Act was a legislative declaration of existing law or was new law, which as above indicated need not be decided for this motion.

9. The United States settled out early in the proceedings and is not a party here. It is unknown if it paid any money to survivors of either passengers or crew, so as to entitle it to indemnity. But in any event any claims it had for indemnity were barred prior to the filing of the instant suit, as nearly as can be made out from the record.

Suffice it to say that the indemnity involved here is not statutory.

It must also be noted that *Kohr v. Allegheny Airlines, Inc.* (7 Cir., 1974) 504 F.2d 400, 403, rehearing *en banc* denied November 26, 1974, cert. denied May 19, 1975, 421 U.S. 978, 95 S.Ct. 1980, 44 L.Ed.2d 470, in overruling the District Court, which had held state law governed, held that notwithstanding any state law on contribution and indemnity, "[t]here should be a federal law of contribution and indemnity governing mid-air collisions such as the one here."

 The right to recover indemnity is based on the principle, whether called equity or implied contract, which prohibits one from profiting by his own wrong or fault at the expense of one who is free from fault or wrong.

*Hillman v. Wallin* (1974) 298 Minn. 346, at 350–51, 215 N.W.2d 810 at 813 ". . . the essentially equitable nature of indemnity . . . precludes the use of strict standards, and . . . requires courts to examine carefully both parties' conduct in light of general notions of justice."

". . . All of these principles are merely attempts to establish guidelines leading to the ultimate goal of doing justice. So far, no one has come up with a complete answer and we will have to permit indemnity on a case-by-case basis where our sense of fundamental fairness seems to require it."

Plaintiffs' claim for indemnity is properly in Court.

## ESTOPPEL

The legal question that presents itself here is this: On this motion for summary judgment can the subrogees of Bonanza, neither of which was a party or participant in any way in cases No. LV 967–969, take the benefit of that trial and the finding of that jury by its verdict against Jeppesen on the separated issue of liability in those cases?

The plaintiffs support their claim on the basis that the equitable doctrine of collateral estoppel entitles them to the benefit of that verdict as final on what it encompassed even though it may have been set aside by stipulation for the purpose of settlement.

 The plaintiffs rely not only on the pretrial order but also upon the records, files, evidence, and proceedings in the previous trial, of which the Court can take judicial notice. That being so it is unnecessary for the plaintiffs to have filed affidavits. In view thereof, especially the admissions of record and the verdict,[10] the Court holds there is "no genuine issue" as to all facts of record, which support the verdict on ultimate facts numbers 1, 2 and 3, heretofore set forth.

The defendants have filed no responsive affidavits denying any of the facts of record in the *Schulze* cases and have not made any showing of any new and different facts or evidence.

The defendant's contention that none of the above-mentioned four issues of ultimate fact were tried in Cases LV 967–969, is contrary to fact, as shown by a copy (omitting title and signatures) of the Pretrial Order, which is attached hereto as "Appendix A." Paragraph VI of the Pretrial Order outlines six fact issues which encompass the ultimate fact issues 1, 2, and 3, hereinbefore set forth.

The two familiar applications of the doctrine of estoppel are "*res judicata*" and "*estoppel in pais.*"

"Estoppel in pais," or estoppel by conduct, word, action, or the lack thereof is not involved in this case. The cases cited by

---

**10.** When the jury returned its verdict, a final judgment was erroneously entered against Jeppesen as to the issue of liability. But, thereafter, the Court vacated such erroneous entry. Liability was a separated and limited issue. And, neither an interlocutory or final judgment can be issued on a verdict after trial covering only the issue of liability with the issue of damages unsettled. Only on a *motion for summary judgment* can an interlocutory judgment be made on the issue of liability leaving damages unsettled. F.R.C.P. 56(c); 58. Final judgment could not be made or entered until the matter of damages was also tried.

the parties under this doctrine are familiar and follow a pattern. None of them are applicable or throw any light upon the question to be resolved here.

This Court having tried the previous case, and, having again reviewed the record, must conclude as to the above three issues mentioned at the beginning of this memo that the following three of the four usually stated essential elements of estoppel are satisfied, viz.: (1) the three issues are identical in each case; (2) the prior action was fully and fairly tried;[11] (3) the element of mutuality is not required in view of this Circuit's acceptance of the *Bernhard* doctrine, *Bernhard v. Bank of America* (1943) 19 Cal.2d 807, 122 P.2d 892. [See *United Air Lines v. Wiener* (9 Cir. 1964) 335 F.2d 379; cert. denied 379 U.S. 951, 85 S.Ct. 452, 13 L.Ed.2d 549, affirming the District Court in holding that mutuality is not required in air crash estoppel (S.D.Cal.1962) 216 F.Supp. 709 at 725 et seq.]

 The *Bernhard* doctrine established that there need not be mutuality between the parties for the application of the doctrine of res judicata *against a defendant where the defendant has had a full opportunity to litigate the question involved and did actually litigate it and had a judgment against it.* However the *Bernhard* doctrine does *not* entitle a defendant to estoppel *against a plaintiff* in an air crash case which had a verdict in favor of that defendant in a previous case by a different plaintiff involved in the same crash. *Humphreys v. Tann* (6 Cir. 1973) 487 F.2d 666, cert. denied, 416 U.S. 956, 94 S.Ct. 1970, 40 L.Ed.2d 307.

The defendants contend, however, that there is a fourth requirement which is an indispensable element of the estoppel claimed here, viz., that there must be *a final judgment,* which means, under F.R. C.P. 58, that there must be the technicality of a separate document, called judgment (F.R.C.P. Form 31) signed by the clerk and entered on the docket.

Concededly, there was no document called ".judgment", which was made or entered, and, following the settlement, after the jury verdict against the defendant, the case was dismissed with prejudice.

The parties have briefed the matter as if the Rules of Decision Act (28 U.S.C. § 1652 as amended 1940) applied, under which the controlling law would be the statutory or case law of Nevada, and if none, the conclusions of this Court as to what the highest Court of Nevada would hold if the case were before it.

The parties have cited neither applicable Nevada statutory law nor controlling Nevada case law. The Court is thus put to either making a determination of what the Nevada Supreme Court would hold, or determining if a federal rule exists, or should be applied, as the Court did in *Kohr v. Allegheny,* supra. It would make little difference which course is followed inasmuch as, in my opinion, the conclusion would be the same as that reached herein.

In the *Kohr* case the Court based its conclusion largely on the preemptions by the United States contained in the various Federal Aviation Acts and the almost all-encompassing provisions thereof regulating air commerce in all its phases, not only as stated in that opinion, but as so broadly and pointedly set forth by Justice Jackson in *Northwest Airlines v. Minnesota* (1944) 322 U.S. 292 at p. 302–303, 64 S.Ct. 950, at p. 955–56, 88 L.Ed. 1283.[12]

11. The defendant's contentions that the Court admitted error in the trial by statements in the recitals of the Order vacating the verdict and dismissing the case are not well taken. There was no such admission. The Court merely recited that its rulings *"might"* be the basis for granting a new trial or reversal on appeal. Such a statement, if demanded, would have to be made by every trial judge, because no trial judge can say in advance with any certainty what conclusions would be reached by an ap-

pellate court, any more than any lawyer can say in advance what decision a trial judge would make. If it were otherwise there would be no need for appellate courts or for trials in the lower courts—mere clerks could do the work.

12. Quoted with approval in *City of Burbank v. Lockheed* (1973) 411 U.S. 624 at pp. 633–34, 93 S.Ct. 1854, 36 L.Ed.2d 547 which found that basic federal preemption occurred by the Fed-

"We are at a stage in development of air commerce roughly comparable to that of steamship navigation in 1824 when *Gibbons v. Ogden,* 9 Wheat. 1, 6 L.Ed. 23, came before this Court. Any authorization of local burdens on our national air commerce will lead to their multiplication in this country. Moreover, such an example is not likely to be neglected by other revenue-needy nations as international air transport expands.

"Aviation has added a new dimension to travel and to our ideas. The ancient idea that landlordism and sovereignty extend from the center of the world to the periphery of the universe has been modified. Today the landowner no more possesses a vertical control of all the air above him than a shore owner possesses horizontal control of all the sea before him. The air is too precious as an open highway to permit it to be "owned" to the exclusion or embarrassment of air navigation by surface landlords who could put it to little real use.

"Students of our legal evolution know how this Court interpreted the commerce clause of the Constitution to lift navigable waters of the United States out of local controls and into the domain of federal control. *Gibbons v. Ogden,* 9 Wheat. 1, 6 L.Ed. 23, to *United States v. Appalachian Electric Power Co.,* 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243. Air as an element in which to navigate is even more inevitably federalized by the commerce clause than is navigable water. Local exactions and barriers to free transit in the air would neutralize its indifference to space and its conquest of time.

"Congress has recognized the national responsibility for regulating air commerce. Federal control is intensive and exclusive. Planes do not wander about in the sky like vagrant clouds. They move only by federal permission, subject to federal inspection, in the hands of federally certified personnel and under an intricate system of federal commands. The moment a ship taxis onto a runway it is caught up in an elaborate and detailed system of controls. It takes off only by instruction from the control tower, it travels on prescribed beams, it may be diverted from its intended landing, and it obeys signals and orders. Its privileges, rights, and protection, so far as transit is concerned, it owes to the Federal Government alone and not to any state government."

■ The same logic which governed those opinions should, and in this Court's opinion does, require the application of a federal rule of estoppel, regardless of what Nevada law might be.

The Ninth Circuit, to which this Court must first look, has dealt with estoppel by judgment, but none of the cases presented the same or even similar procedural factual situations.

In *American Nat. Ins. Co. v. Yee Lim Shee* (9 Cir. 1939) 104 F.2d 688, where the Court refused to apply collateral estoppel where a demurrer was sustained without leave to amend, is to be distinguished. There was no opportunity to be heard, nor any issues of fact or law tried on the merits, such as here.

*American United Life Ins. Co. v. Blackhurst, et al.* (9 Cir. 1940) 108 F.2d 674 is to be distinguished because the issue of liability was not tried or ruled on or even brought up in the previous case. In the instant case the plaintiffs do not seek to apply estoppel to one issue not tried in the previous case, viz., the negligence, if any, of *Bonanza.*

Similarly, in *East Bay Union, etc. v. Fiberboard Paper Products Corp.* (N.D.Cal. 1968) 285 F.Supp. 282, the Court refused to apply estoppel because the issue of the existence of a contract was a fact question which had not been tried in the previous case.

eral Aviation Act of ·1958 [49 U.S.C. 1301 et seq.] as amended in 1968, and held that the Federal Noise Control Act of 1972, 86 Stats. 1234, only reaffirmed and reenforced the 1958 Federal Aviation Act. Hence the Federal preemption existed during all stages of the pertinent events prior to the filing of the within suit as held in *Kohr.*

There is (and one would expect) a paucity of cases with like or similar procedural factual situations as the case at bar. But *Queriolo Trucking Co. v. Superior Court* (1967) 252 Cal.App.2d 194, 60 Cal.Rptr. 389, 393 (rehearing denied, petition for hearing by Supreme Court denied September 27, 1967) is squarely in point. In a previous case arising out of the identical accident, there was a different plaintiff but the same defendant. By agreement of the parties liability was severed from damages. A verdict against the defendant on liability was returned. Thereafter, proceedings were had, which are immaterial here, but in the course of which a settlement was made and the case was *dismissed with prejudice,* which the Court held was a retraxit, and that the judgment of dismissal *with prejudice* was a *final* judgment which had *res judicata* effect against the defendant in the following language:

> "We must look, therefore, for a judgment covering all issues, and we find it in the judgment of dismissal with prejudice in the first case, which was accompanied by the payment of a consideration to Douglas Hoeye that constituted a retraxit and was equivalent to a judgment in favor of Hoeye on the merits, as to which his employer could properly take advantage. (*Ghiringhelli v. Riboni* (1950) 95 Cal.App.2d 503 [213 P.2d 17]; *Datta v. Staab* (1959) 173 Cal.App.2d 613, 620 [343 P.2d 977]; *Rothtrock v. Ohio Farmers Ins. Co.* (1965) 233 Cal.App.2d 616 [43 Cal.Rptr. 716]; Witkin, Cal. Procedure (1965 Supp.) pp. 527–528."

The ruling in *Queriolo* is not the illegitimate orphan imputed to it.

It was held that collateral estoppel applied in a labor contract suit against a defendant in the so-called *"Alexander"* case, on identical issues presented in the *"Zdanok"* case (*Zdanok v. Glidden Co.*) in which the Court stated (2d Cir. 1964), 327 F.2d 944 at 955, cert. denied 377 U.S. 934, 84 S.Ct. 1338, 12 L.Ed.2d 298:

> ". . . [T]here has yet been *no final judgment* on the merits . . . .. But we see no reason why in an appropriate case a ruling that is final on the issue of liability should not preclude the party against whom the decision ran from presenting further evidence on the issue there finally determined. Dealing with this very question of the kind of finality of judgment necessary to create an estoppel, we pointed out, quite recently, that collateral estoppel does not require a judgment 'which ends the litigation * * and leaves nothing for the court to do but execute the judgment,' *Catlin v. United States,* 324 U.S. 229, 233, 65 S.Ct. 631, 89 L.Ed. 911 (1945), but includes many dispositions which, though not final in that sense, have nevertheless been fully litigated. *Lummus Co. v. Commonwealth Oil Refining Co.,* 297 F.2d 80, 89 (2 Cir. 1961), cert. denied, 368 U.S. 986, 82 S.Ct. 601, 7 L.Ed.2d 524 (1962), and cases cited. As we there said, ' *"Finality" in the context here relevant may mean little more than that the litigation of a particular issue has reached such a stage that a court sees no really good reason for permitting it to be litigated again.'* We meant our previous ruling to be final on the hotly contested issue of liability under Glidden's contract with its employees, the Supreme Court affirmed this, and we have now affirmed it again. The mere fact that the damages of the *Zdanok* plaintiffs have not yet been assessed should not deprive that ruling of any effect as collateral estoppel it would otherwise have. It was simply a matter of procedural convenience that caused the district court to consolidate the *Zdanok* and *Alexander* actions, rather than allow the *Zdanok* action to go first to the final judgment to which, in the absence of Supreme Court review, it now shortly must." (Italics supplied.)

See also *Kurlan v. Col. R.* (2 Cir. 1965) 343 F.2d 625 n. 1, p. 629, "general expressions that only final judgments can ever have collateral estoppel effect are considerably overstated." *Usery v. International, etc.* (S.D.N.Y.1976) 422 F.Supp. 1221 at 1229.

It is noted that the underscored portion in the above quotation from *"Zdanok"* is a limited quotation from the *"Lummus"* case. *"Zdanok"* omitted one of the things which *"Lummus"* said was necessary for finality, viz., "the opportunity for review." This is of great significance in view of the fact that *"Zdanok"* (1964) was two and one-half years later than *"Lummus"* (1961) and both opinions were written by Judge Friendly (with Judge Lombard on each panel).

More importantly, estoppel was applied in the *"Alexander"* case (joined with *"Zdanok"*) in which, as set forth in the first sentence quoted above, *"[t]here has yet been no final judgment on the merits."* Thus, *"Zdanok"* dropped the element of reviewability by appeal as a pre-requisite to "finality" when applying equitable estoppel.

The Court could have entered a separate judgment as to each party plaintiff in the *Schulze* cases, *only* after a separate trial of the issue of damages to each plaintiff under F.R.C.P. 54(b) because the damages as to each plaintiff would be in a different sum.

■ The determination of liability is but one step to securing a money judgment. There cannot be a final judgment until both liability and the amount of damages are judicially determined.[13]

The separate trial on the issue of liability under F.R.C.P. 42(b) makes no sense unless *finality* can attach to the verdict of the jury. F.R.C.P. 42(b) is one of the most useful of tools in multiparty tort cases to carry out the mandate of F.R.C.P. 1, to secure the "just, speedy and inexpensive determination of every action."

■ Had no settlement been made, the *Schulze* cases would have forthwith had to proceed to separate verdict and judgment on damages as to *each* plaintiff before the entry of final judgments, in favor of each plaintiff in a different sum.[14] (F.R.C.P. 58). And the defendants could not have stopped

the "entry" of a final judgment except by settlement.

But even if there were no *"finality"* to the jury verdict and the proceedings following it in the *Schulze* cases, the precepts and principles of equity require that result.

■ The principles of equity evolved as a necessity in order to obtain justice because the law by reason of its universality was deficient. Equity in its true and genuine meaning is the soul and spirit of all law, and positive law is construed by it and rational law is made by it. In this, equity is synonymous with justice. Equity depends essentially upon the particular circumstances of each individual case. That being so, *there can be no established rules and fixed principles laid down* for its application, without destroying its very existence, and reducing it to positive law. The nature of equity is to amplify, enlarge, and add to the letter of the law and every particular case stands upon its own circumstances. Story's *Equity Jurisprudence* Vol. I, Ch. 1; Chitty's *Blackstone*, Bk. I, Sec. 1.

Applying equitable principles does not mean that each new equity case must be decided without recourse to precedent, but it does mean that equitable relief will not be barred just because there is no acceptable precedent.

The 9th Circuit, when met with a problem for which there was neither statute nor precedent, did not hesitate to fashion a remedy for the problem presented in *Berdie v. Kurtz* (9th 1937) 88 F.2d 158, 159. The Court said:

. . . "Equity in the process of development has assumed the qualities of a composite system, expansive rather than abstract in relation to settled rules by which rights are measured and processes invoked—not always defined. The power of the chancellor and the processes of a court of equity must be equal to any

---

**13.** Subdivision (d) of Rule 56 relating to summary judgment in a case not fully adjudicated on motion, does not contemplate a summary judgment for any portion of a claim less than the whole. Citing *Biggins v. Oltmer Iron*

*Works* (7th 1946) 154 F.2d 214; *Coffman v. Federal Laboratories,* (3rd 1948) 171 F.2d 94.

**14.** That procedure was followed by the Court in the *United Airlines* cases, 216 F.Supp. 701.

emergency and portend to protect the poor and the rich alike, compel justice and right to every one in its hold. The cradle of equity is the power to afford adequate remedy where the law is impotent; it does not create new rights, but affords a remedy for existing rights. Every known step in the court of equity was born of some emergency to apply settled rules to new conditions. The entrance to the portals of equity are not branded, labeled, or limited, nor has equity or its processes become static, *Chicago Auditorium Ass'n v. Willing* (C.C.A.) 20 F.2d 837, but must continue to grow, and if need be extend its borders so as to encompass 'any civil right of a pecuniary relation.' *Toledo, etc., R. Co. v. Pennsylvania Co.* (C.C.) 54 F. 746, 19 L.R.A. 395; *Southern California R. Co. v. Rutherford* (C.C.) 62 F. 796. A court of equity may contrive new remedies, the remedies at law being inadequate. *Joy v. St. Louis,* 138 U.S. 1, 11 S.Ct. 243, 34 L.Ed. 843."

The scope of equitable estoppel is broad.

As stated by Judge Mathes of this Court granting estoppel against the United States in *U. S. v. Certain Parcels of Land* (S.D.Cal. 1955) 131 F.Supp. 65 at p. 71:

" . . . [E]quity jurisdiction conferred on inferior courts of the United States by * * * the Judiciary Act of 1789, 1 Stat. 78, and continued [to date] * * * is that of the English court of chancery at the time of the separation of the two countries." *Matthews v. Rodgers,* 1932, 284 U.S. 521, 529, 52 S.Ct. 217, 221, 76 L.Ed. 447.

"From the beginning", as Mr. Chief Justice Stone declared for the Court in *Gordon v. Washington,* 1935, 295 U.S. 30, 55 S.Ct. 584, 79 L.Ed. 1282, "the phrase 'suits in equity' has been understood to refer to suits in which relief is sought according to the principles applied by the English Court of Chancery before 1789, as they have been developed in the federal courts". 295 U.S. at page 36, 55 S.Ct. at page 587; accord, *Waterman v. Canal-Louisiana Bank,* 1909, 215 U.S. 33, 43, 30 S.Ct. 10, 54 L.Ed. 80; *In re Sawyer,* 1888, 124 U.S. 200, 209, 8 S.Ct. 482, 31 L.Ed. 402; *Payne v. Hook,* 1868, 7 Wall. 425, 74 U.S. 425, 430, 19 L.Ed. 260; *United States v. Howland,* 1819, 4 Wheat. 108, 17 U.S. 108, 115, 4 L.Ed. 526.

Moreover, as the Court declared in *Payne v. Hook,* supra: "The equity jurisdiction conferred on the Federal Courts * * * is uniform throughout the different States of the Union." 7 Wall. at page 430, 74 U.S. at page 430. . . .

Equitable estoppel stands for the basic precepts of common honesty, clear fairness and good conscience. *Myers v. Hurley Motor Co.,* 1927, 273 U.S. 18, 24, 47 S.Ct. 277, 71 L.Ed. 515; *Mahoning Inv. Co. v. United States,* Ct.Cl.1933, 3 F.Supp. 622, certiorari denied, 1934, 291 U.S. 675, 54 S.Ct. 526, 78 L.Ed. 1064; see: *Hill v. National Bank,* 1878, 97 U.S. 450, 452–453, 24 L.Ed. 1051; *Henshaw v. Bissell,* 1873, 18 Wall. 255, 256, 271, 85 U.S. 255, 256, 271, 21 L.Ed. 835; *Branson v. Wirth,* 1872, 17 Wall. 32, 42, 84 U.S. 32, 42, 21 L.Ed. 566; *Insurance Co. v. Wilkinson,* 1871, 13 Wall. 222, 233, 80 U.S. 222, 233, 210 L.Ed. 617; *First Federal Trust Co. v. First Nat. Bank,* 9 Cir., 1924, 297 F. 353, 356; *Grand Central Public Market v. United States,* D.C.S.D.Cal., 22 F.Supp. 119, 126–127, 129, appeal dismissed, 9 Cir., 1938, 98 F.2d 1023; *California Packing Corp. v. Sun-Maid Raisin Growers of California,* D.C.S.D.Cal.1934, 7 F.Supp. 497, 499, reversed on other grounds, 9 Cir., 81 F.2d 674, certiorari denied, 1936, 298 U.S. 668, 56 S.Ct. 833, 80 L.Ed. 1391."

The principles of equity being necessary to achieve justice in the relationship between human beings and their property in the pastoral and simple life of England at the time of the formation of this country, how much more necessary it is in the complicated rushing way of life of today, from which there is no escape.

The simple logic of life today, and the increase in technology and the changes in the way of life and the problems of multibillion dollar business with their enormous and anonymous progeny engaging in manufacture, transportation, distribution and

treating thousands of products for thousands of uses in thousands of ways today, all unheard or undreamed of at the adoption of the Constitution, compels the conclusion that equity, the life giver of the law, should be expanded instead of contracted and compressed into a series of *ipse dixits* and *sine qua nons,* such as found in written rules of action and laws, which in addition to statutes now include an inconceivable number of rules and regulations, promulgated as laws by an almost inconceivable number and variety of boards, commissions, departments, bureaus, seminars, counsels, institutes, etc., in the national, state and local governments [15].

What would happen if the defendants were not estopped as to the three issues mentioned at the beginning of this memorandum and which were decided by the jury after the defendant had a full opportunity to and did present its case?

The same witnesses and the same evidence would have to be produced as were produced in the previous trial, LV 967–969. That trial from the beginning to verdict took from October 7, 1969 to October 20, 1969. The trial was eight years ago. The events occurred 13 years ago. Who can say if the witnesses' memories are too dim to recall those events? And who can say that the witnesses can even be found? The exhibits were returned to the parties upon the settlement eight years ago. Moreover, all the exhibits were highly significant, such as, for instance, the tape of the flight recorder, *the original of which had been lost,* so that the parties had to depend on a photographic copy of it. Neither plaintiffs

nor defendants in that case then had any reason to suppose the exhibits would be needed. Who knows, after eight years, whether or not the exhibits can be found, or are even in existence? The cost of the trial to the plaintiffs was $11,653.34 [16]. Furthermore, assuming all the witnesses and evidence could be produced there exists the possibility, which should always be avoided, of an inconsistent and contrary result on the same evidence.

And, suppose that, for some reason or another, the *Travis* case had been filed in another district and had not been transferred to Nevada so it could be consolidated with the *Schulze-Fitzpatrick,* case for trial. Could it be logically contended that the plaintiffs in the *Travis* case would have to go through all the cost and difficulties above outlined to settle the question of the liability of Jeppesen? It is submitted that such holding would be manifestly so unjust as to bring the very name of law into disrepute.

As Judge Stone stated in a concurring opinion in the *Queriolo* case [supra]:

. . . "[if] collateral estoppel is not applicable, the bifurcated trial becomes a vehicle by which a defendant can, by using the procedure defendant followed here, litigate identical liability issues a number of times in multiple actions arising from the same transaction."

Both equity and case law compel the conclusion that the three ultimate fact issues set forth in the early part of this memorandum were fairly and fully tried and finally settled by the verdict in the *Schulze* cases.

---

**15.** The proliferation of laws, rules and regulations since 1934 and their constant amendments and supplements are some indication of the complexity of today's society. In 1934 the U.S.Code of laws was contained in one Volume of 2416 pages containing approximately *1,932,-800* words; today, that same Code [1970 unannotated edition with supplements through 1975] is in 29 volumes containing approximately 29,894 pages with more than *21,187,000* words.

The Regulations of the various government departments in 1934 were scattered and few. Today, The Code of Federal Regulations with all its past and present amendments are necessary

to legal research. That monster now consumes 42 shelves of 35 inches each and contains a total more than *371,750,000* words. Then, there are State laws, rules and regulations. All such laws and regulations attempt to anticipate and regulate by fixed rule the conduct of people in their relations with one another and their property.

If there is a Savior that brings Justice out of such an incomprehensible flood, it has to be equity with its case by case solutions.

**16.** It was reported to the Court that one expert witness in the previous case cost well over $1,000.00.

## ORDER UNDER F.R.C.P. 56(d)

From the foregoing it is clear that a *judgment* cannot be rendered on either the *whole case,* or the *whole issue* of liability, and that a trial will be necessary on the issue of ultimate fact number 4, i. e., whether or not Bonanza was guilty of any negligence which proximately contributed to the air crash of November 15, 1964.

This conclusion requires the following Order under F.R.C.P. 56(d):

THE COURT HEREBY ORDERS that the following specific ultimate facts, in the trial and in all further proceedings in this case, be and are hereby found to be without controversy and shall therefore be accepted as true, upon which neither side will be required or permitted to produce contrary evidence, viz.:

1. That Jeppesen produced a faulty approach plate.

2. That its use by the pilots of Bonanza in approaching Las Vegas for a landing was a proximate cause of the crash of Bonanza's Flight No. 114 on November 15, 1964, and the death of all the plane's human occupants.

3. That the pilots of said plane were not guilty of any negligence which proximately contributed to said crash.

Counsel will advise the Court within one week when they will be ready to attend a pre-trial conference for the purpose of settling an agreed pre-trial order, and setting for trial the remaining issue of contributory negligence of Bonanza, and any other remaining issues, including the amount of damages.

## APPENDIX "A"

### PRETRIAL CONFERENCE ORDER

Following pre-trial proceedings pursuant to Rule 16 of the Federal Rules of Civil Procedure of this Court, IT IS ORDERED:

I. *This is an action for:*

Wrongful death arising out of a crash of Bonanza Airlines Flight 114 en route from Phoenix, Arizona to Las Vegas, Nevada, which occurred on November 15, 1964, at approximately 8:25 P.S.T. It is alleged that the accident was the result of the negligence of the defendant in its design of the instrument approach plate allegedly being used by the crew in making an instrument approach to McCarran Airport and the breach of warranty of the defendant as to the instrument approach plate, and that the instrument approach plate was defective in its design so as to be subject to misinterpretation by the flight crew. It is further alleged and contended that the flight crew misinterpreted the approach plate as a result of the defects contained in it, causing the aircraft to crash and causing the death of all aboard. The issues are framed by the pleadings in the respective consolidated actions.

II. *Federal jurisdiction is invoked upon the ground:*

Of diversity of citizenship in the amount in controversy being in excess of $10,000.00.

III. *The following are facts admitted and require no proof:*

That on November 15, 1964 a Bonanza Airlines Fairchild F–27A aircraft bearing FAA registration number N 745 L, operating as Flight 114, crashed 9.7 nautical miles from the Las Vegas VORTAC on the 196 degrees radial. The aircraft crashed at night, however the exact time of the crash is disputed. The plaintiffs FITZPATRICK, SCHULZE and TRAVIS are the sole surviving heirs-at-law of the captain, first officer and stewardess of said aircraft. The other plaintiffs herein are the sole surviving heirs-at-law of their respective decedents who were fare-paying passengers aboard Flight 114.

That prior to leaving Phoenix, Arizona, the aircraft carried 5600 pounds of jet (A) fuel which was sufficient for said aircraft to reach its destination at Las Vegas, Nevada, and if a landing could not be made, then to proceed to its alternate airport in Ontario, California in accordance with Federal Air Regulations. The aircraft takeoff weight and center of gravity were within

allowable limits. Prior to leaving Phoenix, Flight 114 had been given a "daily inspection" on November 15, 1964 at 14,393:55 hours on the airframe and that there were no pilot writeup or discrepancies noted from other sources. The flight departed the ramp at Phoenix, Arizona at 19:14 P.S.T. Prior to takeoff the flight crew was given an altimeter setting of 29.88 inches of mercury by the Phoenix ground controller. The verification of this altimeter was requested by the flight crew who further indicated that the altimeter setting in the aircraft appeared to be nearer 29.81 than 29.88.

That prior to the accident the defendant JEPPESEN designed, printed and distributed approach plates to Bonanza Airlines one of their subscribers, including a VOR–DME # 3 approach plate, for McCarran Field, Las Vegas, Nevada. The JEPPESEN approach plates were submitted by Bonanza Airlines to the Federal Aviation Agency and approved by them for use by Bonanza Airlines prior to November 15, 1964 for instrument approaches to McCarran Field. The flight crew was instructed by FAA ground facilities to make a VOR–DME # 3 approach. The aircraft crashed during its attempted approach to McCarran Field at which time it was being monitored both in asimuth and distance from McCarran Field by approach control radar. The crash occurred 9.7 miles from the Las Vegas VORTAC at an elevation of approximately 3,575 feet M.S.L.

The minimum altitude approved by the Federal Aviation Agency for an aircraft making a VOR–DME # 3 approach to McCarran Field is 6,000 feet between the distances of 15 and 10 nautical miles from the Las Vegas VORTAC. The minimum altitude approved by the Federal Aviation Agency for an aircraft making the same approach between the distances of 10 and 6 nautical miles from the VORTAC is 4,300 feet. An airplane conforming to the altitudes required by the FAA limitation should cross the 10 mile DME fix at an altitude of at least 6,000 feet and descend to an altitude of not less than 4,300 feet at the 6 mile DME fix.

Captain Fitzpatrick was the pilot in command of the above mentioned aircraft and was responsible for its action. The descent of the aircraft below minimum altitudes between the 10 mile fix and the 6 mile fix was a proximate cause of the crash.

That just prior to the crash, weather conditions at McCarran Field were permissible for a landing as per instructions given to Bonanza Flight 114 by approach controllers. Bonanza Flight 418 was operating approximately three to four minutes ahead of Bonanza Flight 114 and executed a missed approach because of weather conditions then existing. Western Airlines Flight 196 also executed a missed approach because of weather conditions.

The captain's clock on his side of the instrument panel on Bonanza N745L was set at Greenwich Mean Time and the clock on the co-pilot's side of the instrument panel was set on Pacific Standard Time. The captain's clock was stopped at 04:24 G.M.T., which is the same as 20:24 P.S.T., or 8:24 P.M. Among the instruments aboard said aircraft, was one DME Module located at the lower right hand side of the pilot's instrument panel. Bonanza and FAA regulations require the door between the cockpit and the passenger compartment must be locked and closed during flight and that the locking bar was found to be in the fully extended and locked position on the aircraft after the accident.

There were no flight or ground maintenance difficulties experienced by aircraft number N745L on the four flights it made on November 15, 1964 prior to Flight 114. The total flight time on N745L on November 15, 1964 was eight hours forty-seven minutes and that the log sheets for all flights on that day did not show any maintenance writeups by the crew. A. W. Campbell, the Bonanza Airlines mechanic who met the aircraft on its arrival in Phoenix, Arizona at 8:19 P.S.T. as Flight 426, was not advised by the crew of any maintenance problems on the aircraft.

The two VOR–OBS indicators were found to be set as follows: Captain's indica-

tor set on a course of 021 degrees; co-pilot's indicator set at 020 degrees.

The order of arrival of aircraft at Las Vegas on the night of the crash and near the time of the crash was as follows: Western Airlines Flight 196; Bonanza Airlines Flight 418; Bonanza Airlines Flight 114; and Western Airlines Flight 198.

The maintenance records show that aircraft N745L was properly inspected and maintained throughout its history to the time of the crash in accordance with the standards set forth by the Federal Aviation Agency Operation Specifications for aircraft maintenance for Bonanza Airlines, Inc. Further, N745L was properly equipped for scheduled passenger service and released for flight on November 15, 1964 in an airworthy condition. Further, it was properly instrumented for instrument approaches and was equipped with a Fairchild Model 5424 Flight Recorder bearing serial number 1273.

A copy of the JEPPESEN VOR–DME # 3 approach chart for McCarran Field, Las Vegas, Nevada had been adopted by Bonanza Airlines and had been provided to Captain Fitzpatrick and co-pilot Schulze prior to November 15, 1964, and that this chart should have been in their possession in the cockpit of the aircraft. The altitude of McCarran Field, Las Vegas, Nevada is 2,171 feet M.S.L.

Prior to the accident, Bonanza Airlines synthetic training equipment did not have and it never had the equipment necessary to simulate VOR–DME approaches although it did have the capability of simulating VOR approaches. Captain Fitzpatrick had never made a VOR–DME # 3 approach to McCarran Field prior to the time of the crash and the only VOR–DME number approach made by him was a VOR–DME # 1 approach made on July 8, 1964. Co-pilot Schulze had never made a VOR–DME approach of any type to McCarran Field prior to the accident. The VOR–DME # 3 approach to McCarran Field was a new approach plate which first became effective on October 3, 1964 and from that date up to the night of November 15, 1964,

weather conditions had never required any Bonanza Aircraft to use a VOR–DME instrument approach to McCarran Field.

After the crash, the DME Module "Units" Scale read 9.65 nautical miles when recovered from the wreckage of Flight 114 and the DME Module "Tens" Scale was just under 10 nautical miles when recovered. On examination after the accident, the windshield de-icing switch was found in the "off" position and the windshield wiper control switch was found in the "one-half" position. The propeller de-icing switches were found in the "on" position.

Bonanza Airlines Company personnel who had occasion to see and talk to Captain Fitzpatrick and First Officer Schulze during preparations for the flight concluded that both men were normal in appearance and attitude. Further a "turn around" inspection was completed of the aircraft prior to its release from Phoenix, Arizona as Flight 114 and no maintenance discrepancies were noted. No Discrepancy reports were made by any flight personnel connected with the operation of the aircraft regarding the operation, function or accuracy of its altimeters for any flight for a period of thirty days before November 15, 1964, nor any time during November 15, 1964.

IV. *The reservations as to the facts recited in Paragraph III above are as follows:*

None.

V. *The following facts, not admitted, are not to be contested at the time of trial by evidence to the contrary:*

None.

VI. *The following issues of fact, and no others, remain to be litigated upon trial:*

1. What caused Bonanza Airlines Flight 114 to descend below the FAA minimum approach altitudes prior to and at the time of the crash.

2. Whether the flight crew of Bonanza Airlines Flight 114 was using a VOR–DME # 3 approach plate designed by the defendant JEPPESEN.

3. Whether as a result of negligence on the part of JEPPESEN in its design of the chart, or as the result of a breach of any warranty made by JEPPESEN or as the result of a defect in the design of the chart, the flight crew was caused to descend below those minimum altitudes set by the Federal Aviation Agency and proximately cause the aircraft to crash.

4. Whether the crew of Fitzpatrick and/or Schulze was individually or jointly guilty of any act or acts of negligence which was a proximate cause of the crash. (This defense is not urged as to the plaintiffs Will, Domenge and Travis.)

5. Whether the flight crew assumed the risk.

6. The extent of the damages sustained by the plaintiffs herein.

VII. *The exhibits to be offered at the trial are as follows:*

1. VOR–DME # 3 instrument approach plate;

2. A blocked JEPPESEN manual;

3. Federal Aviation Agency Form 511;

4. Weather reports;

5. Funeral bills for each decedent;

6. Approximately 31 photographs of the wreckage of the aircraft, the general scene of the accident and certain parts of the aircraft, including a photograph of the flight recorder tape;

7. A graphic chart;

8. Tape recordings of the communications with the flight crew with Albuquerque Center, Los Angeles Center and Las Vegas Approach Control, or certified copies of the transcriptions of said tapes;

9. A sectional chart of the Las Vegas area;

10. A photograph of the cockpit of the Fairchild F–27;

11. JEPPESEN design data and working drawings;

12. A Holmes and Narver Survey drawing;

13. Releases and closing papers executed by the plaintiffs herein in consummating a settlement with the United States of America.

There will be no objections to the offering of the above listed exhibits with the exception of No. 7 and No. 8 and No. 13 above. As to those exhibits, all appropriate objections are reserved by the parties.

VIII. *The following issues of law, and no others, remain to be litigated upon the trial:*

Whether or not the statute of limitations has run on the amendment to the complaint in the Will matter which sets forth a cause of action in strict liability in tort.

IX. The foregoing admissions having been made by the parties and the parties having specified the foregoing issues of fact and law, remaining to be litigated, this ORDER shall supplement the pleadings and govern the course of the trial of the cause, unless modified to prevent manifest injustice.

Dated at Los Angeles, California, this _____ day of <u>April</u>, 1969.