OMEGA INDUSTRIES, INC., Plaintiff,

v.

Dr. Thomas RAFFAELE, individually; Does I through X; and Roe Corporation XI through XX, Defendants.

No. CV–S–93–312–RJJ.

United States District Court, D. Nevada.

June 28, 1995.

Joseph S. Kistler, of Gordon, Silver & Beesley, Ltd., for plaintiff.

Ruth L. Cohen, Asst. United States Attorney, District of Nevada, for defendants.

## OPINION

JOHNSTON, United States Magistrate Judge.

This matter came before the Court for a bench trial upon consent of the parties pursuant to 28 U.S.C. § 636(c).

## FINDINGS OF FACT

Plaintiff, Omega Industries, Inc. (Omega), is a commercial development company which owns the Sahara Professional Center located at 2069 East Sahara Avenue in Las Vegas, Nevada. Omega is owned and operated by its president, Edward M. Nigro. Defendant, Dr. Thomas S. Raffaele (Dr. Raffaele), is a licensed optometrist who operated a private optometry business in Las Vegas from 1978 to 1992.

On September 25, 1985, Omega and Dr. Raffaele entered into a lease agreement for office space located at the Sahara Professional Center. Plaintiff's Exhibit 1. On August 21, 1991, Omega and Dr. Raffaele terminated their 1985 lease agreement and entered into a second lease agreement with respect to a larger office which was also located at the Sahara Professional Center. Plaintiff's Exhibit 2. This second agreement was for a period of five years commencing November 1, 1991. Because Dr. Raffaele agreed to a relatively long term of five years, Omega consented to make certain tenant improvements and to reduce its regular per square foot rental rate. Dr. Raffaele also signed a lease guaranty whereby he personally guaranteed the payment of all rent, together with all costs and attorneys' fees incurred by Omega in enforcing the office lease. Plaintiff's Exhibit 3.

In September 1992, Dr. Raffaele contacted the United States Public Health Service regarding potential public service opportunities as a optometrist. Dr. Raffaele became interested in moving from Las Vegas and utilizing his optometry skills through public service opportunities after his children had left home either to attend college or to enter military service. Plaintiff's Exhibit 22.[1] The Public Health Service subsequently provided Dr. Raffaele with application materials for the position of a Public Health Service Officer and indicated that, if selected, he could legally terminate his office lease under Section 304 of the Soldiers' and Sailors' Civil Relief Act of 1940 (50 U.S.C.Appx. § 534).

On October 30, 1992, after one year of satisfactory performance under the lease, Dr. Raffaele submitted an application to the United States Department of Health and Human Services (HHS) for an appointment as a commissioned officer in the Public Health Service. Plaintiff's Exhibit 22. In February 1993, HHS notified Dr. Raffaele that he had been selected for the position of optometrist at the Public Health Service's Indian Health Center in Lame Deer, Montana. Plaintiff's Exhibit 5. Dr. Raffaele was assigned the rank of Lieutenant Commander and ordered to report on "active duty" in Lame Deer on April 5, 1993. Plaintiff's Exhibit 23.

Dr. Raffaele subsequently notified Omega of his appointment and indicated that he would be terminating his office lease at the end of March 1993. On April 5, 1993, Dr. Raffaele reported to his assignment in Lame Deer and, on April 25, 1993, provided written confirmation to Omega that he had terminated his lease pursuant to Section 304 of the Soldiers' and Sailors' Civil Relief Act. Plaintiff's Exhibit 8. On March 16, 1993, HHS also notified Omega that, as a commissioned officer in the Public Health Service, Dr. Raffaele was entitled to legally terminate his lease agreement under the Act. Plaintiff's Exhibit 7. Thereafter, Omega immediately commenced efforts to re-lease the office

space previously occupied by Dr. Raffaele. Ten months later, Omega leased the office to a new tenant, Prime Health. Due to depressed market conditions, Omega was forced to offer Prime Health a reduced rental rate.

Omega has now filed the instant action against Dr. Raffaele for breach of the 1991 lease agreement. In doing so, Omega acknowledges that subsection 304(2) of the Soldiers' and Sailors' Civil Relief Act relieves military personnel from leasehold obligations which exist at the time they are called into service. However, Omega asserts that, under subsection 304(2), the court may modify or restrict this leasehold relief if equity so requires. Accordingly, Omega argues that equity bars Dr. Raffaele from obtaining any relief from his leasehold obligations because: (1) he acted deceptively and with bad faith in securing and terminating the 1991 lease agreement; and, (2) he was not called into military service at a time of national crisis, but, rather, he voluntarily applied for active duty during a time of peace. Omega therefore asserts that Dr. Raffaele's utilization of subsection 304(2) is contrary to the intent and public policy of the Soldiers' and Sailors' Civil Relief Act. Consequently, Omega seeks damages for breach of the 1991 lease agreement in the form of lost rental income; reduced rental income, induced tenant improvements; realty commissions; and attorneys' fees and costs. Plaintiff's Exhibit 18.[2]

Dr. Raffaele opposes Omega's action on several grounds. First, Dr. Raffaele argues that the court may only modify or restrict his leasehold relief, under subsection 304(2), to the extent of ordering him to fulfill his monthly rental obligations and/or to forfeit his lease security deposit. Dr. Raffaele therefore asserts that this court has no authority to grant damages to Omega in the form of induced tenant improvements, realty commissions and attorneys' fees and costs. Second, Dr. Raffaele claims that Omega

---

1. The evidence does not indicate that Dr. Raffaele was interested in the Public Health Service prior to entering into the lease agreement with Omega.

2. In sum, Omega seeks $50,452.58 for the following: Tenant Improvements: $8,474.01; Realty Commissions: $3,202.50; Lost Rental Income: $21,350.00; Reduced Rental Income: $6,720.00; Attorneys' Fees: $9,515.50; and Costs of $1,190.57. Plaintiff's Exhibit 18.

should be denied equitable damages because it has violated the equitable maxim that "he who comes into equity must come with clean hands." Finally, Dr. Raffaele argues that there is no equitable justification to deny him the leasehold relief provided by subsection 304(2).

### DISCUSSION AND CONCLUSIONS OF LAW

The court must determine: (1) the extent to which it may grant equitable remedies to a lessor under subsection 304(2) of the Soldiers' and Sailors' Civil Relief Act; (2) if the court may grant equitable remedies, whether Omega has come before the court with "unclean hands" and, therefore, is barred from obtaining equitable damages under subsection 304(2); and, (3) whether principles of equity and justice bar Dr. Raffaele from obtaining the leasehold relief provided in subsection 304(2). To properly address these issues, the court must first discuss the scope and applicability of the Soldiers' and Sailors' Civil Relief Act.

### I. SOLDIERS' AND SAILORS' CIVIL RELIEF ACT

■ The Soldiers' and Sailors' Civil Relief Act of 1940 (50 U.S.C.Appx. §§ 501 et seq.) suspends or terminates various civil liabilities of persons in military service. Subsection 304(2) of the Act (50 U.S.C.Appx. § 534(2)) specifically allows military personnel, as a lessee, to terminate lease obligations which exist at the time they are called into service.[3] Subsection 304(2) also provides, however, that a court may modify or restrict this relief from a leasehold obligation where equity so requires. Subsection 304(2) provides:

(2) Any such lease may be terminated by notice delivered to the lessor (or his grant-

ee) or to the lessor's (or his grantee's) agent by the lessee at any time following the date of the beginning of his period of military service. Delivery of such notice may be accomplished by placing it in an envelope properly stamped and duly addressed to the lessor (or his grantee) or to · the lessor's (or his grantee's) agent and depositing the notice in the United States mails. Termination of any such lease providing for monthly payment of rent shall not be effective until thirty days after the first date on which the next rental payment is due and payable subsequent to the date when such notice shall is delivered or mailed. In the case of all other leases, termination shall be effected on the last day of the month following the month in which such notice is· delivered or mailed and in such case any unpaid rental for a period preceding termination shall be proratably computed and any rental paid in advance for a period succeeding termination shall be refunded by the lessor (or his assignee). *Upon application by the lessor to the appropriate court prior to the termination period provided for in the notice, any relief granted in this subsection shall be subject to such modifications or restrictions as in the opinion of the court justice and equity may in the circumstances require.*

50 U.S.C.Appx. § 534(2) (emphasis added).

Application of subsection 304(2) has been extended to commissioned officers of the Public Health Service. Specifically, 42 U.S.C. § 213(e) provides:

Active service of commissioned officers of the [Public Health] Service shall be deemed to be active military service in the Armed Forces of the United States for the purposes of all rights, privileges, immuni-

---

**3.** The Soldiers' and Sailors' Civil Relief Act may also act to relieve Dr. Raffaele from the lease guaranty that he signed with respect to the lease. Specifically, 50 U.S.C.Appx. § 513(1) provides:

Whenever pursuant to any of the provisions of this Act [sections 501 to 591 of this Appendix] the enforcement of any obligation or liability, the prosecution of any suit or proceeding, the entry or enforcement of any order, writ, judgment, or decree, or the performance of any other act, may be stayed, postponed or suspended, such stay, postponement, or suspen-

sion may, in the discretion of the court, likewise be granted to sureties, guarantors, endorser, accommodation makers, and others, whether primarily or secondarily subject to the obligation or liability, the performance or enforcement of which is stayed, postponed, or suspended.

Therefore, if the court determines that Dr. Raffaele should be relieved of his leasehold obligations pursuant to subsection 304(2), this relief will likewise apply to the lease guaranty.

ties, and benefits now or hereafter provided under the Soldiers' and Sailors' Civil Relief Act of 1940 (50 U.S.C.Appx. 501 et seq.).

■ Dr. Raffaele, as a commissioned officer in the Public Health Service, is therefore eligible to obtain the leasehold relief conferred in subsection 304(2) of the Soldiers' and Sailors' Civil Relief Act.

. . . .

## A. Extent Court May Grant Equitable Remedies to Lessors Under Subsection 304(2)

■ The court must next determine the extent to which an equitable remedy may be granted to a lessor under subsection 304(2). Dr. Raffaele argues that the court only has authority to grant an equitable remedy equal to the military person's monthly rental obligations and security deposit. Omega disagrees, arguing that a lessor may be awarded additional remedies similar to those it now seeks, i.e., induced tenant improvements, realty commissions and attorneys fees and costs.

This issue is one of first impression and therefore requires a statutory interpretation of subsection 304(2). To conduct this interpretation, the court will first examine the plain language of this provision. *See United States v. Neville,* 985 F.2d 992, 995 (9th Cir.1993), citing *Church of Scientology of California v. U.S. Dept. of Justice,* 612 F.2d 417, 421 (9th Cir.1979); *Sacramento Regional County Sanitation District v. Reilly,* 905 F.2d 1262, 1268 (9th Cir.1990). The court will then turn to legislative history if the language of subsection 304(2) is unclear and ambiguous. *See Neville,* 985 F.2d at 995 (9th Cir.1993), citing *Church of Scientology of California,* 612 F.2d at 421.

■ Turning first to the statutory language, subsection 304(2) allows military personnel to terminate their leasehold agreements which exist at the time they enter the service. Subsection 304(2) also provides that

military personnel may receive a refund of any unpaid rent or security deposit. *See Patrikes v. J.C.H. Service Stations,* 180 Misc. 917, 41 N.Y.S.2d 158 (N.Y.City Ct.1943). However, the statutory language provides that this leasehold relief "shall be subject to such modifications or restrictions as in the opinion of the court justice and equity may in the circumstances require." This language provides the court with broad latitude in granting equitable remedies. Thus, if termination of a lease pursuant to subsection 304(2) causes damages in excess of a military person's monthly rental obligations and security deposit, the court may, if equity and justice require, grant an equitable remedy that fully compensates a lessor for those damages. For example, if a military person—who knows that he or she will soon be invoking subsection 304(2) to terminate an existing lease—wrongfully induces a lessor to make tenant improvements, a court may find that equity requires that an equitable remedy be granted in an amount equal to both the cost of those improvements and the monthly rental obligations of that military person. The court finds no language in subsection 304(2) which would limit its authority to grant such an equitable remedy.

■ The legislative history accompanying the Soldiers' and Sailors' Civil Relief Act also reveals that Congress did not intend to limit the court's authority to award an equitable remedy under subsection 304(2). This history reveals that "'the very heart of the policy of the Act' was to provide 'judicial discretion . . . instead of rigid and undiscriminating suspension of civil proceedings.'" *Conroy v. Aniskoff,* 507 U.S. ——, ——, 113 S.Ct. 1562, 1568, 123 L.Ed.2d 229 (1993) (Scalia, J., concurring). Indeed, when Congress initially enacted the Soldiers' and Sailors' Civil Relief Act at the end of the First World War [4], it stated that courts were to be given full discretion to ensure that the Act would be applied in accordance with the principles of equity.

4. The Soldiers' and Sailors' Act of 1940 is substantially identical to the Soldiers' and Sailors' Act of 1918 (40 Stat. 440). Therefore, the legislative intent history of the 1918 Act may be examined to determine the intent of the 1940 Act. *Boone v. Lightner,* 319 U.S. 561, 565, 63 S.Ct. 1223, 1226, 87 L.Ed. 1587 (1943).

"Instead of the bill we are now considering being arbitrary, inelastic, inflexible, the discretion as to dealing out even-handed justice between the creditor and the soldier, taking into consideration the fact that the soldier has been called to his country's cause, rests largely, and in some cases, in the breast of the judge who tries the case."

*Conroy*, —— U.S. at ——, 113 S.Ct. at 1568, quoting 55 Cong.Rec. 7787 (1917) (statement of Rep. Webb, Chairman of House Judiciary Committee).

The plain language of subsection 304(2) and its accompanying legislative history clearly indicate that courts have broad latitude and discretion in granting equitable remedies to lessors. Dr. Raffaele's assertion that subsection 304(2) limits a court from granting an equitable remedy in an amount in excess of a military person's rental obligation and security deposit is without merit. The court may therefore grant the full remedies sought by Omega if equity so requires.

. . . .

**B. Application of the Unclean Hands Doctrine**

"The unclean hands doctrine derives from the equitable maxim that 'he who comes into equity must come with clean hands.'" *Ellenburg v. Brockway, Inc.*, 763 F.2d 1091, 1097 (9th Cir.1985). "This maxim 'closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant.'" *Id.*, quoting *Precision Inst. Mfg. Co. v. Automotive Maintenance Mach. Co.*, 324 U.S. 806, 814, 65 S.Ct. 993, 997, 89 L.Ed. 1381 (1945).

 Application of the unclean hands doctrine is left to the broad discretion of the trial court. *Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 814, 65 S.Ct. 993, 997, 89 L.Ed. 1381 (1945); *Washington Capitols Basketball Club, Inc. v. Barry*, 419 F.2d 472, 478 (9th Cir.1969). Although there is

"no clear-cut formula" for its application (*West Los Angeles Institute for Cancer Research v. Mayer*, 366 F.2d 220, 226 (9th Cir.1966); *see also Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 245–46, 54 S.Ct. 146, 147–48, 78 L.Ed. 293 (1933)), this doctrine will bar a party from receiving an equitable remedy where that party has acted in bad faith (*Wells Fargo & Company v. Stagecoach Properties, Inc.*, 685 F.2d 302, 308 (9th Cir.1982)) with respect to the subject matter of its claims. *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 847 (9th Cir.1987), citing, *CIBA–GEIGY Corp. v. Bolar Pharmaceutical*, 747 F.2d 844, 855 (3d Cir.1984), *cert. denied*, 471 U.S. 1137, 105 S.Ct. 2678, 86 L.Ed.2d 696 (1985). The party asserting this doctrine has the burden of proving its application. *See e.g. Conan Properties, Inc. v. Conans Pizza, Inc.*, 752 F.2d 145, 150 (5th Cir.1985); *Jicarilla Apache Tribe v. Andrus*, 687 F.2d 1324, 1337 (10th Cir.1982).

 Dr. Raffaele argues that Omega's claim for equitable damages should be denied on the grounds that Omega has come before this court of equity with unclean hands. First, Dr. Raffaele claims, and it is undisputed, that he carpeted, painted and wallpapered the office prior to commencement of the lease.[5] Yet, Dr. Raffaele claims that Omega has failed to credit him for these tenant improvements in its calculation of damages.

Second, Dr. Raffaele argues that certain cabinets, installed and jointly paid for by Omega and himself, were removed from the office by Omega after he terminated the lease. Dr. Raffaele claims that these cabinets were subsequently discarded by Omega without an attempt to recover any resale or salvage value. Thus, Dr. Raffaele asserts that Omega has failed to mitigate its damages with respect to this tenant improvement.

Third, Dr. Raffaele asserts that Omega's calculation of damages wrongfully included an amount for unpaid rent during his last month as a tenant under the lease. It is

---

**5.** Raffaele claims that he painted and wallpapered approximately 80% of the office's wall space. The court recognizes, however, that Omega also painted some areas of the office. *See* Plaintiff's Exhibit 14.

undisputed that this rent was, in fact, paid when Omega retained his security deposit which equaled one month's rental payment.

Finally, Dr. Raffaele asserts that Omega seeks not merely to be made whole but, rather, vindictively seeks retribution and a "windfall" profit from him. Specifically, he claims that Mr. Nigro owns other businesses which "absorbed" the losses caused by the lease termination. He claims that these other businesses absorbed these losses through measures such as "cutting expenses, raising revenues and other tax ways." Dr. Raffaele therefore claims that Omega is seeking remedies for damages which have already been "recouped."

The court rejects Dr. Raffaele's assertion that Omega has come before the court with unclean hands. First, Dr. Raffaele fails to prove that Omega acted in bad faith by not reimbursing or crediting him for carpeting, painting and wallpapering the office. The evidence reveals that the parties apparently agreed that Dr. Raffaele would make these tenant improvements at his own expense. Additionally, section 11.3 of the lease agreement states that, upon termination of the lease agreement, all tenant improvements made by Dr. Raffaele would become the sole property of Omega. The court therefore finds no bad faith in Omega's failure to reimburse or credit Dr. Raffaele for tenant improvements of which Dr. Raffaele was responsible for and of which Omega became the sole owner. Furthermore, Dr. Raffaele's assertion that he is entitled to credit or reimbursement is, in effect, a claim which is separate from Omega's and therefore should have been asserted by Dr. Raffaele in the form of a counterclaim. The court finds no bad faith on the part of Omega for failing to recognize Dr. Raffaele's claim.

Second, Dr. Raffaele has also failed to prove that Omega acted with bad faith by failing to mitigate its damages with respect to the cabinets which it had installed. Mr. Nigro testified that Omega's new tenant, Prime Health, was responsible for "gutting" the office space previously occupied by Dr. Raffaele. As a result, Mr. Nigro indicated that he was unaware of how these cabinets were discarded or whether they had any salvage value. Thus, although Omega may have been negligent in failing to recover the salvage value of these cabinets and thereby mitigate its damages, the court finds no evidence of bad faith which would rise to the level of misconduct necessary to invoke application of the unclean hands doctrine. *See Dollar Systems, Inc. v. Avcar Systems, Inc.,* 890 F.2d 165, 171 (9th Cir.1989) (gross negligence does not invoke unclean hands doctrine).

Third, Dr. Raffaele fails to prove that Omega acted in bad faith when it failed to credit him in an amount equal to his security deposit. Mr. Nigro acknowledged that Omega may have been negligent in failing to properly credit Dr. Raffaele for this security deposit. Yet, absent evidence that Omega acted in bad faith, this negligence does not invoke application of the clean hands doctrine. *See Dollar Systems, Inc.,* 890 F.2d at 171.

Fourth, Dr. Raffaele fails to adequately articulate, or substantiate, his claim that Omega has already recovered its losses through Mr. Nigro's other businesses. Specifically, Dr. Raffaele offers no evidence that Mr. Nigro's other business either cut expenses or raised revenues in order to compensate for Omega's losses. Moreover, even if Mr. Nigro's other businesses had implemented such measures, there would be no reasonable justification to attribute the resulting profits as a recovery of Omega's losses. Certainly, if Mr. Nigro's other businesses could have implemented such measures to increase profits, they would have done so regardless of whether Omega sustained any losses as a result of the lease termination.

Dr. Raffaele also fails to substantiate its assertion that Omega "recouped" its losses by "other tax ways." No specific or competent evidence is offered in support of this assertion. This claim therefore lacks merit.

The court therefore finds no justification to dismiss Omega's suit under the unclean hands doctrine.

## C. Principles of Equity and Justice

Having found that Omega claim is not barred under the unclean hands doctrine, the court must turn to principles of equity and justice to determine whether Omega is entitled to the equitable remedies it seeks.

■■■ There are no "established rules and fixed principles laid down" for the application of equity. *Aetna Casualty and Surety Company v. Jeppesen & Company*, 440 F.Supp. 394, 403 (D.Nev.1977); *see also International Salt Co. v. United States*, 332 U.S. 392, 400–01, 68 S.Ct. 12, 17, 92 L.Ed. 20 (1947). Rather, "equity depends essentially upon the particular circumstances of each individual case." *Id.* District Courts are therefore given broad discretion in modeling their equity judgments. *International Salt Co.*, 332 U.S. at 400–01, 68 S.Ct. at 17. Allocating the burden of proof is also left to the court's discretion. *Boone v. Lightner*, 319 U.S. 561, 569–70, 63 S.Ct. 1223, 1228–29, 87 L.Ed. 1587 (1943).

### 1. Omega's Equity Arguments

■■■ As previously indicated, Omega argues that Dr. Raffaele should not be relieved of his leasehold obligations because: 1) Dr. Raffaele has acted deceptively and with bad faith; and 2) Dr. Raffaele's utilization of subsection 304(2) is contrary to the intent and public policy of the Soldiers' and Sailors' Civil Relief Act. These are proper issues for a court of equity to address. *See Virginian Railway Co. v. System Federation No. 40*, 300 U.S. 515, 550, 57 S.Ct. 592, 600, 81 L.Ed. 789 (1937) (equitable remedies may depend on matters such as bad faith and the public interest).

### a. Deception and Bad Faith

■■■ Omega claims that it was Dr. Raffaele's five year lease commitment which induced it to agree to the conditions of the lease. Yet, Omega asserts that, at the time he committed to the lease agreement, Dr. Raffaele failed to disclose that he had plans to move his practice from Las Vegas. Omega claims that it "never would have agreed to the Office Lease, and certainly would not have made the tenant improvements to the leasehold" had it known of these plans.

■■■ Omega effectively argues that Dr. Raffaele should be barred from utilizing subsection 304(2) on the basis of equitable estoppel. Equitable estoppel "arises where one party by concealment or false representation intentionally deceives another party as to the true state of the facts to the detriment of the second party." *California State Board of Equalization v. Coast Radio Products*, 228 F.2d 520, 525 (9th Cir.1955). This principle "stands for the basic precepts of common honesty, clear fairness and good conscience." *Aetna Casualty and Surety Company*, 440 F.Supp. at 404.

The evidence does not establish that Dr. Raffaele intentionally deceived Omega at the time the lease agreement was signed. First, there is no evidence that Dr. Raffaele considered opportunities in the Public Health Service prior to signing the lease agreement. Rather, the evidence indicates that Dr. Raffaele first contacted the Public Health Service, regarding potential service opportunities, in September 1992—one year after the lease was signed. Indeed, it was not until Dr. Raffaele first contacted the Public Health Service that he learned that, because of certain age limit requirements which the Service had set, he needed to apply before his lease expired in order to be eligible for service. The evidence also indicates that Dr. Raffaele was not aware of subsection 304(2)'s relief provisions until he contacted the Public Health Service. Thus, there is no evidence that Dr. Raffaele intended to either utilize subsection 304(2), or apply to the Public Health Service, prior to the signing of the lease agreement.

Second, there is no evidence that, prior to entering the lease, Dr. Raffaele had planned to move his optometry practice out of Las Vegas during the term of the lease. Dr. Raffaele testified that he had desired to eventually move his optometry practice to Walla Walla, Washington. However, Dr. Raffaele stated that he did not reveal these plans to Omega because they were tentative long term plans which would take effect after the lease expired. Omega offers no evidence

which disputes Dr. Raffaele's testimony.[6] The evidence therefore does not establish that Dr. Raffaele acted deceptively or with bad faith prior to the signing of the lease.

### b. Policy and Intent of Soldiers' and Sailors' Civil Relief Act

■ Omega also argues that, after entering into the lease, Dr. Raffaele applied to the Public Health Service merely to take advantage subsection 304(2)'s leasehold relief and thereby provide a means of moving from Las Vegas without violating his lease. Omega asserts that subsection 304(2) was not intended to be utilized in this manner. Specifically, Omega argues that "[i]n other words, this is not a case where a soldier has been called-up to serve his country in a time of crisis such as the Persian Gulf War."

Analysis of Omega's argument requires an examination of both the public policy behind the Soldiers' and Sailors' Act, and Dr. Raffaele's motives in asserting the Act's protection.

■ The public policy behind the Soldiers' and Sailors' Civil Relief Act of 1940 is to allow military personnel to fulfill their duties unhampered by obligations incurred prior to their call. *Patrikes v. J.C.H. Service Stations, Inc.,* 180 Misc. 917, 41 N.Y.S.2d 158, 165 (N.Y.City Ct.1943). Although this Act applies in times of peace, as well as war, it is not to be applied for any unwarranted purpose.

> [I]t is readily ascertained that the primary desire of Congress is to give protection to the soldier.... The object is to relieve the soldier from the consequences of his handicap in meeting financial and other obligations incurred prior to his call to duty, so that his energies may be devoted to his military duties, unhampered by mental distress occasioned by the consequences to him or to his dependents flowing from his inability to meet his obligations.
>
> This fundamental policy of exemption 'is a token of intention to be ranked as first and

foremost.' [citation omitted] Statutes enacted for the benefit of persons in the military service are in furtherance of public policy, which exempts such persons in various ways, even in time of peace [citation omitted]; but, though they are remedial in character, they may not be invoked for any 'needless or unwarranted purpose,' but must be administered to accomplish substantial justice. [citation omitted]

*Id.*

■ This policy also extends to protect career officers in times of peace where no national emergency exists. *See Conroy v. Aniskoff,* 507 U.S. ——, —— – ——, 113 S.Ct. 1562, 1564–66, 123 L.Ed.2d 229, 235–236 (1993). It is "always to be liberally construed" (*see Boone,* 319 U.S. at 574, 63 S.Ct. at 1230) and applied in a " 'broad spirit of gratitude' " towards service personnel. *Patrikes,* 41 N.Y.S.2d at 166, citing *Benedict v. Higgins,* 165 A.D. 611, 151 N.Y.S. 42, 44 (1915).

■ Because this public policy is to be liberally construed, a court of equity must exercise extreme caution in withholding the protection in subsection 304(2). *See Virginian Railway Co. v. System Federation No. 40,* 300 U.S. 515, 552, 57 S.Ct. 592, 601, 81 L.Ed. 789 (1937) (It is a paramount principle of equity that courts will go much farther both to grant and to withhold relief in furtherance of the public interest than when only private interests are involved). The court will therefore withhold the Act's protection from Dr. Raffaele only if there is clear and strong evidence indicating he is utilizing the Act for purely unwarranted purposes.

There is no clear or strong evidence which supports a finding that application of subsection 304(2) is unwarranted. Rather, several factors reveal that Dr. Raffaele's application to the Public Health Service was reasonably grounded in a sincere desire to render service to his country rather than in a sinister manner to avoid his lease obligations. First, Dr. Raffaele knew, when he submitted his application, that he could be assigned to ser-

---

**6.** The court also notes that, to this date, Dr. Raffaele still has not moved to the state of Washington.

vice in any geographic area of the country and that he could be called into combat service. Dr. Raffaele also knew that there was little chance, if any, that there would be an opportunity to serve in the state of Washington where he had hoped to someday establish his practice. Despite these circumstances, Dr. Raffaele still submitted his application for service.

Second, Dr. Raffaele recognized that his Public Health Service assignment would likely be in a remote geographical area. Although he desired to eventually retire in the rural area of Walla Walla, Washington, Dr. Raffaele knew that his assignment would likely be to a completely isolated region of the country. Indeed, Dr. Raffaele's eventual assignment to Lame Deer, Montana, is in an isolated area with few modern conveniences and located 105 miles from the nearest airport in Billings, Montana. In this regard, Dr. Raffaele's living quarters in Lame Deer is a small modular home half the size of his previous home in Las Vegas.

Third, Dr. Raffaele also knew that his work in the Public Health Service would be significantly more demanding than his work in private practice. Indeed, his practice in Lame Deer demands longer work hours, involves twice the number of patients, and is conducted in a small four hundred square foot clinic with just one technical assistant.

Fourth, the court finds no evil intent or bad motive in the timing of Dr. Raffaele's application. As previously discussed, Dr. Raffaele applied during the term of his lease because the Public Health Service indicated that, due to his age, he would only remain eligible to apply until July 1993. Therefore, in order to be eligible for service, Dr. Raffaele was required to submit his application during the term of the lease.

Finally, the court finds that Dr. Raffaele and his family have obtained no financial advantage from his work in the Public Health Service. During the three years prior to entering the service, the average income of Dr. Raffaele and his wife was approximately $68,000.00 annually. Plaintiff's Exhibits 19–21. Currently, Dr. Raffaele's annual income and benefits total approximately $59,000.00. Plaintiff's Exhibits 24–25. The court has no

evidence regarding what type of employment opportunities, if any, are available to Dr. Raffaele's wife in the remote area of Lame Deer. Thus, the evidence indicates that the Raffaele's have sacrificed with respect to both total income and living conditions as a result of Dr. Raffaele's assignment to Lame Deer.

These factors indicate that Dr. Raffaele knew his work in the Public Health Service would require some degree of sacrifice and would not provide a means of moving to the state of Washington, where he had eventually hoped to move his optometry practice. It is therefore reasonable to conclude that Dr. Raffaele's service in the Public Health Service is grounded in a sincere effort to offer public service rather than in a deceptive or sinister motive. Furthermore, the court recognizes that Public Health Service officers, like Dr. Raffaele, generally obtain their positions through voluntary applications rather than being called to serve during a time of national crisis. Nevertheless, Congress has still acted to extend the leasehold relief of subsection 304(2) to these officers. Thus, "liberally construing" the Soldiers' and Sailors' Civil Relief Act in a "broad spirit of gratitude," the court finds that Dr. Raffaele is relieved from his lease obligations as provided under subsection 304(2).

## CONCLUSION

Based on the foregoing, and good cause appearing therefore, the Clerk of the Court is hereby directed to enter judgment for the defendant.