Edward F. LAZARSKI, Jr., Appellant

v.

ARCHDIOCESE OF PHILADELPHIA, Cardinal Justin Rigali and Cardinal Anthony Bevilacqua, Appellees.

Superior Court of Pennsylvania.

Argued Feb. 13, 2007.

Filed May 21, 2007.

Reargument Denied July 19, 2007.

461

Kenneth Millman and Jay N. Abramowitch, Wyomissing, for appellant.

Michael D. O'Mara, Philadelphia, for appellees.

BEFORE: GANTMAN, PANELLA and POPOVICH, JJ.

OPINION BY POPOVICH, J.:

¶ 1 Appellant Edward F. Lazarski, Jr., appeals the entry of summary judgment in favor of Appellees Archdiocese of Philadelphia, Cardinal Justin Rigali, and Cardinal Anthony Bevilacqua. We affirm.

¶ 2 The Pennsylvania Rules of Civil Procedure governing summary judgment instruct, in relevant part, that the court shall enter judgment whenever there is no genuine issue of any material fact as to a necessary element of the cause of action. Pa.R.C.P. 1035.2(1). In considering the merits of a motion for summary judgment, a court views the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. *Jones v. SEPTA*, 565 Pa. 211, 772 A.2d 435 (2001). Finally, the court may grant summary judgment only when the right to such judgment is clear and free from doubt. *Marks v. Tasman*, 527 Pa. 132, 589 A.2d 205, 206 (1991).

¶ 3 We now proceed to decide whether Appellant's complaint was filed timely pursuant to the applicable statute of limitations. Generally speaking, the statute of limitations begins to run as soon as the right to institute and maintain suit arises. *See Crouse v. Cyclops Industries*, 560 Pa. 394, 745 A.2d 606, 611 (2000). "Whether a complaint is timely filed within the limitations period is a matter of law for the court to determine." *Id.* The cause of action which Appellant brought before the court is based upon sexual abuse (tortious conduct) committed by Father Leneweaver while he was under the employ, supervision, and agency of Appellees. There is a two-year statute of limitations for such causes of action. *See* 42 Pa.C.S.A. § 5524.

¶ 4 Appellant does not dispute the applicability of the two-year statute of limitations, nor does he disagree with *Crouse* regarding when a cause of action ripens. Appellant contests the trial court's determination that the right to maintain his action was not stayed by allegations of Appellees' fraudulent concealment. To appreciate the result reached by the trial court, a recitation of the facts viewed in a light most favorable to the non-moving party is necessary. *Jones, supra.*

¶ 5 Under the preceding standard, the record discloses that in 1975, Appellant was twelve years of age and first met Father Raymond O. Leneweaver while a parishioner at St. Agnes of West Chester, Pennsylvania—Appellant was enrolled in its school, participated in its Catholic Youth Organization (CYO), and served as a parish altar boy. Over the next five years, Father Leneweaver engaged in sexual activity with Appellant while the two attend-

ed x-rated movies, went on various trips, and visited the church rectory. On July 10, 1980, Appellant's parents received an anonymous letter advising that Father Leneweaver had been removed from another parish because of his relationship with young boys. When confronted with this information, Appellant admitted engaging in sexual activity with Father Leneweaver and informed his parents of the duration of the abuse. The parents took their concerns to St. Agnes' pastor, Monsignor Lawrence F. Kelly, warning that they "had not ruled out going to the police unless the Archdiocese took action to ensure that Father Leneweaver was not on the altar or preaching again, was 'away from here,' would never be reassigned to another parish and would be prohibited from having access to children." Complaint, 1/06, ¶ 59. Monsignor Kelly advised Appellant and his parents that the offending priest would not be permitted to sexually abuse other children, and he was placed in a hospital. While in treatment, Father Leneweaver was permitted contact with other boys from St. Agnes.

¶ 6 Appellant's mother learned of these events and contacted Monsignor Kelly, who again assured her and Appellant that Father Leneweaver would not be placed in a position to sexually abuse children. Nonetheless, in September of 1980, Father Leneweaver was assigned by Appellees to a parish in Bucks County, Pennsylvania. Appellant argues that such conduct is emblematic of Appellees' material misrepresentations about Father Leneweaver's status as a priest in the Archdiocese of Philadelphia or his ability to continue to interact with children. Complaint, 1/06, ¶ 72(b), (c), (g), and (h). Appellant continues that such "misrepresentations about the real reason for Father Leneweaver's status in the Archdiocese after his removal from St. Anges[ ] stopped [Appellant] and his parents from making reports to law enforcement authorities and/or exercise their legal rights." *Id.* at 75.

¶ 7 In point of fact, "[p]rior to reading a Grand Jury Report in the fall of 2005, [Appellant] did not know, nor did he have any reason to know, that he had a cause of action against [Appellees] for causing tortuous [*sic*] injury to him due to [Appellees'] concealment of their knowledge of Father Leneweaver's [ ... ] action towards other minor parishioners and their vehement and public denials [ ... of the same]." Complaint, 1/06, ¶ 102. In January of 2006, Appellant filed a fourteen-count complaint against Appellees seeking money damages for tortious injuries sustained at the hands of Father Leneweaver while under the supervision of Appellees beginning in 1975 and ending on July 10, 1980.[1]

¶ 8 Appellant argued that the two-year statute of limitations for personal injuries was stayed because of Appellees' fraudulent concealment: "[Appellees] obstructed the prosecution of [Appellant's] cause of action against them by continually concealing the fact that they had knowledge of Father Leneweaver's predilections before

---

1. Appellant did not file suit against his abuser, but did sue Appellees under theories of a common law duty of reasonable care (count I), a breach of fiduciary duty (count II), a failure to provide a safe and secure environment (count III), negligent supervision (count IV), Appellees acting in concert with Father Leneweaver to conceal his pedophilic propensities (count V), supplying false information/negligent misrepresentation (count VI), a failure to protect against foreseeable risks (count VII), a duty to warn of unreasonable risk of harm (count VIII), negligent supervision (count IX), use of incompetent persons (count X), fraudulent concealment (count XI), intentional failure to supervise (count XII), intentional failure to warn (count XIII), and he sought punitive damages (count XIV).

the time [Appellant] was abused." *Id.* at ¶ 195.

¶ 9 In reply, Appellees stated that the statute of limitations was not tolled by either allegations of fraudulent concealment or Appellant's service in the military. The trial court granted Appellees' motion for summary judgment. A timely appeal followed raising three issues for our review; to-wit:

1. DID THE TRIAL COURT ERR IN PREMATURELY GRANTING SUMMARY JUDGMENT WHERE INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS HAD BEEN SERVED BY [APPELLANT] BUT NOT ANSWERED BY [APPELLEES] AND DEPOSITIONS HAD YET TO BE CONDUCTED?

2. WHERE [APPELLANT], IN RESPONSE TO A MOTION FOR SUMMARY JUDGMENT BASED UPON THE STATUTE OF LIMITATIONS, PRESENTS EVIDENCE IN THE FORM OF AFFIDAVITS, LETTERS, AND A REPORT OF A COUNTY INVESTIGATING GRAND JURY SETTING FORTH FACTS SUPPORTING THE ALLEGATIONS RAISED IN HIS COMPLAINT THAT [APPELLEES] MADE FRAUDULENT MISREPRESENTATIONS DIRECTLY TO HIM AND/OR HIS PARENTS AS TO THEIR LACK OF KNOWLEDGE OF ANY HISTORY OF THEIR PRIEST/EMPLOYEE SEXUALLY ABUSING CHILDREN PRIOR TO HIS ABUSE OF [APPELLANT] AND THE PUNITIVE ACTION TO BE TAKEN AGAINST THE SEXUAL PREDATOR IN RESPONSE TO THE REPORT THAT HAD BEEN BROUGHT TO THEIR ATTENTION BY [APPELLANT] AND/OR HIS PARENTS TO RELAX THEIR VIGILANCE, WAS IT AN ERROR FOR THE TRIAL COURT TO ENTER SUMMARY JUDGMENT AGAINST [APPELLANT] AND DISMISS HIS ESTOPPEL CLAIM UNDER THE FRAUDULENT CONCEALMENT EXCEPTION TO THE STATUTE OF LIMITATIONS?

3. WHERE [APPELLANT], VIA AFFIDAVIT, PRESENTS EVIDENCE OF HIS ENLISTMENT IN AND CONTINUED SERVICE FOR THE UNITED STATES NAVY FROM JULY 1, 1982, TO THE PRESENT AND HE WAS LAST SEXUALLY ABUSED BY A PRIEST/EMPLOYEE OF [APPELLEES] WITHIN 2 YEARS OF THE DATE OF HIS ENLISTMENT, WAS IT, UNDER FEDERAL LAW, AN ERROR FOR THE TRIAL COURT TO GRANT [APPELLEES'] MOTION FOR SUMMARY JUDGMENT AND DISMISS [APPELLANT'S] COMPLAINT?

Appellant's brief, at 5–6.

 ¶ 10 Before examining the merits of Appellant's Issue No. 1, we need to assure ourselves that it was preserved for appellate review consistent with *Commonwealth v. Lord*, 553 Pa. 415, 419, 719 A.2d 306, 309 (1998), which held that Appellant's failure to comply with a trial court's order for submission of a Pa.R.A.P. 1925(b) statement containing all issues sought to be raised on appeal would result in a waiver of those issues not included in a Rule 1925(b) statement. Herein, Appellant filed a Rule 1925(b) statement raising five issues for our review,[2] but conspicuous by its

---

**2.** Appellant's Rule 1925(b) statement raised the following five issues, which were reduced to three in his appellate brief; to-wit:

1. Did the learned Trial Court err in granting Appellees' Motion for Summary

absence is Appellant's Issue No. 1. Therefore, we find it waived for appeal purposes. *Lord, supra; Forest Highlands Cmty. Ass'n v. Hammer,* 879 A.2d 223, 226 (Pa.Super.2005) (An appellant must comply whenever the trial court orders the filing of a statement of matters complained of on appeal pursuant to Rule 1925(b); any issues not raised in a Rule 1925(b) statement will be deemed waived.). The same result does not obtain with respect to Issues No. 2 and No. 3. *See* footnote 1, *supra.*

¶ 11 As a prelude to addressing Appellant's Issue No. 2, a review of the doctrine of fraudulent concealment and its estoppel effect on the running of the statute of limitations are imperative.

 ¶ 12 The statute of limitations in an action to recover damages for personal injury is two years. The running of the statute may be stayed and a defendant estopped from asserting it as a defense in clear cases of fraud, deception, or concealment. *Baselice v. Franciscan Friars Assumption BVM Province, Inc.,* 879 A.2d 270, 278 (Pa.Super.2005), *appeal denied,*

586 Pa. 733, 891 A.2d 729 (2005). The Pennsylvania Supreme Court summarized the legal principles relevant to establishing a claim of estoppel in *Walters v. Ditzler,* 424 Pa. 445, 227 A.2d 833 (1967):

> (a) mere mistake, misunderstanding or lack of knowledge do not toll the running of the statute of limitations; (b) if, through fraud, deception or concealment of facts, a [defendant] lulls an injured person or his representatives into a sense of security so that such person's vigilance is relaxed, then the [defendant] is estopped from evoking the statute; (c) the fraud which will toll the statute and effect an estoppel need not be fraud in the strictest sense, *i.e.,* inclusive of an intent to deceive, but may be fraud in the broad sense, *i.e.,* inclusive of an unintentional deception; (d) an estoppel becomes operative only in clear cases of fraud, deception or concealment; (e) the statute of limitations will run against persons under a disability [ ... ].

*Walters,* at 449–50, 227 A.2d at 835 (citations omitted). The doctrine of fraudulent

> Judgment and dismissing Appellant's Complaint?
>
> 2. Did the learned Trial Court err in determining that the statute of limitations barred the claims raised in [Appellant's] Complaint despite the fact, in response to the Motion for Summary Judgment, evidence, including but not limited to Affidavits, a letter, excerpts of the Report of the Grand Jury in the case of *In Re: County Investigating Grand Jury,* Misc. No. 03–00–239 and excerpts from the response of the Archdiocese of Philadelphia to the Grand Jury Report, was submitted which expressly created material issues of fact as to whether the doctrine of fraudulent concealment estopped Appellees from asserting the statute of limitations pursuant to *Meehan v. Archdiocese of Philadelphia,* 870 A.2d 912 (Pa.Super.2005) and its progeny?
>
> 3. Did the learned Trial Court err in failing to recognize that *Meehan v. Archdi-*

> *ocese of Philadelphia, supra,* and its progeny carve out an exception to the statute of limitations argument presented by Appellees which estops Appellees from asserting the statute of limitations pursuant to the facts contained in the evidence produced in Appellant's Response to Appellees' Motion for Summary Judgment?
>
> 4. Did the learned Trial Court err in failing to recognize that the tolling provision of the Servicemembers Civil Relief Act, 50 APP. U.S.C.S. § 526(a), tolls the statute of limitations on Appellant's claims against Appellees beginning July 1, 1982, and continuing to the present as a result of Appellant's continuous service in the United States Navy during that time period?
>
> 5. Did the learned Trial Court commit an error of law and/or an abuse of its discretion in granting the Motion for Summary Judgment?
>
> *See* Exhibit B attached to Appellant's brief.

concealment is an exception to the requirement that a complaining party must file suit within the statutory period. *Kingston Coal Co. v. Felton Min. Co.*, 456 Pa.Super. 270, 690 A.2d 284, 290 (1997) (*citing Molineux v. Reed*, 516 Pa. 398, 532 A.2d 792, 794 (1987)). Moreover, "in order for fraudulent concealment to toll the statute of limitations, the defendant must have committed some affirmative independent act of concealment upon which the plaintiff[ ] justifiably relied." *Id.*, 690 A.2d at 290.

¶ 13 Appellant and his parents knew he was injured no later than July of 1980, knew the identity of the primary cause of the injury, knew the abuser was an employee of the Archdiocese of Philadelphia, and knew that some of the abuses took place on church property, yet Appellant and his parents conducted no investigation into any cause of action against the abuser save for advising St. Agnes' pastor of the events. It is undisputed that Appellant and his parents knew the Archdiocese employed the abuser and that some of the abuses occurred on church property. These facts alone were sufficient to put Appellant and his parents on notice that there was a possibility that the Archdiocese had been negligent. Appellant attempts to skirt the running of the statute of limitations by reliance upon the doctrine of fraudulent concealment, but it is to no avail here.

¶ 14 Appellant does not allege that Appellees misled him into believing that the alleged sexual abuse did not occur, that it had not been committed by Father Leneweaver, or that it had not resulted in injury to Appellant. Appellees never concealed from Appellant the fact of the injury itself. Nor does Appellant allege that he was lied to by Appellants with regard to the identity of his abuser or his abuser's place within the Archdiocese. In a similar context,

this Court held such allegations of fraudulent concealment did not toll the statute of limitations, but we did caution:

> Had the plaintiffs (sometime after the abuse but before the running of the statute of limitations) questioned the Archdiocese about their [priests/]abusers (for example, questions about their abusers' current location or history within the church), and had the Archdiocese affirmatively and independently acted in response to the plaintiffs' inquiries so as to mislead the plaintiffs into foregoing their suits, the fraudulent concealment exception would later allow the plaintiffs' suit. The general and systematic conduct alleged by the plaintiffs here, however, does not constitute an affirmative act for purposes of the fraudulent concealment exception and the plaintiffs have not shown that they relied on any affirmative act of concealment by the defendants which caused them to forego pursuit of their causes of action. We agree that "to postpone the accrual of causes of action until [the plaintiffs] completed their investigation of all potential liability theories would destroy the effectiveness of the limitations period." Therefore the fraudulent concealment exception is inapplicable and does not toll the statute of limitations in this matter. [citation omitted]

*Meehan v. Archdiocese of Philadelphia, et al.*, 870 A.2d 912, 922 (Pa.Super.2005), appeal denied, 584 Pa. 717, 885 A.2d 985 (2005).

¶ 15 In July of 1980, Appellant and his parents met with their parish priest (Monsignor Kelly) and offered to refrain from "going to the police" provided the Archdiocese took measures prohibiting Father Leneweaver from reassignment to another parish and precluding his access to children. Monsignor Kelly agreed, but the promise was short-lived with Father Le-

neweaver's continuing contact with minor boys from St. Agnes while in treatment at a local hospital. When Appellant's mother protested to Monsignor Kelly upon learning of these events, she was met with continuing assurances (for a second time [3]) that the offending priest would not be placed in a position where he could sexually abuse children. However, within two months after Monsignor Kelly assured Appellant and his parents of the restraints upon Father Leneweaver, he was reassigned by the Archdiocese of Philadelphia to St. Joseph's parish in Bucks County, Pennsylvania.

¶ 16 It is Appellant's position that Appellees' "misrepresentations about the real reason for Father Leneweaver's status in the Archdiocese after his removal from St. Agnes, stopped [him] and his parents from making reports to law enforcement authorities and/or exercis[ing] their legal rights." Complaint, 1/06, ¶ 75; *see also id.* at ¶ 72(b) (Appellees began in July of 1980 and continued to the present to conceal essential information from Appellant in the form of "material misrepresentations of fact to [Appellant] and/or [Appellant's] parents about Father Leneweaver's status as a priest in the Archdiocese and/or his ability to continue to interact with children."); *id.* at ¶ 72(f) ("Providing inaccurate information to the publishers of the parish and school bulletin with the Archdiocese where Father Leneweaver was assigned [ ... ] both before and after he abused [Appellant]."); *id.* at ¶ 72(g) ("Providing inaccurate information as to the assignment status of Father Leneweaver

[ ... ]."); *id.* at ¶ 72(h) ("Intentionally failing to announce Father Leneweaver's assignments to new parishes."); *id.* at ¶ 67 ("[Appellant] and his parents relied on Monsignor Kelly's aforesaid representations to their detriment [that Father Leneweaver would not be reassigned].").

¶ 17 Although it may be true that Monsignor Kelly breached his agreement with Appellant and his parents that Father Leneweaver would not be reassigned to another parish, this does not translate into Appellees or their representatives engaging in fraudulent concealment inhibiting Appellant or his parents from learning that he had sustained "injuries" at the hands of Father Leneweaver earlier than the fall of 2005.

Prior to reading the Grand Jury Report in the fall of 2005, [Appellant] did not know, nor did he have any reason to know, that he had a cause of action against [Appellees] for causing tortuous [*sic*] *injury* to him due to [Appellees'] concealment of their knowledge of Father Leneweaver's and/or other Predator Priests' actions toward other minor parishioners and their vehement and public denials as exemplified by their media statements issued on January 4, 1988, of any truth to the allegations contained in related matters that the [Appellees] had a plan and/or policy to ignore complaints made against its offending clerics and to conceal such criminal conduct.

The *injuries* that [Appellant] sustained as a result of the actions of [Appellees] could not have been discovered

---

**3.** With Monsignor Kelly's broken promises assuring that Father Leneweaver would not be placed in a position to sexually assault minor boys, "[t]hese facts alone were sufficient to put [Appellant and/or his parents] on notice that there was a possibility that [Appellees] had been negligent." *Baselice,* 879 A.2d at 278; *Meehan,* 870 A.2d at 921. No facts have

been alleged that would have caused a reasonably diligent person to refrain from exploring or pursuing possible claims against Appellees for over thirty years, especially after Appellant and/or his parents learned of Appellees' failed promise to excise Father Leneweaver from contact with minor boys.

by him earlier due to [Appellees'] fraudulent concealment of their active involvement in protecting Father Leneweaver and other predator priests known to them to be child molesters.

Complaint, 1/06, ¶¶ 101–102 (emphasis added); *see also id.* at ¶ 116 ("[Appellant] was unaware until at the earliest the fall of 2005, that [Appellees'] continued concealment [ . . . ] o[f] information regarding the misconduct of Father Leneweaver [ . . . ] aided, enabled, exacerbated, encouraged and resulted in causing *injuries* to [Appellant], thus tolling and/or suspending the running of the statute of limitations against [Appellees] as to all claims." (emphasis added)). Stated in another way, the essence of Appellant's fraudulent concealment argument is that the Appellees' conduct in general (denying and hiding information of predator priests in the Archdiocese) and Monsignor Kelly's conduct in particular (breaching promise not to reassign the offending priest) concealed from him an additional theory of liability for the alleged sexual abuse relating back to Appellees.

¶ 18 No later than July of 1980, both Appellant and his parents were cognizant of sexual abuses ("injuries") committed by Father Leneweaver upon the minor child over the preceding five years, which abuses were recounted to Monsignor Kelly. Consequently, Appellant having admitted being sexually abused by Father Leneweaver as early as the spring of 1976, he or his parents should also have been aware that Appellees, as the priest's employers, were potentially liable for that abuse. *See Meehan,* 870 A.2d at 922 ("for a cause of action to accrue, the entire theory of the case need not be immediately apparent [ . . . ] as soon as [Appellant or his parents] became aware of the alleged abuse, [he or his parents] should also have been aware that the [Appellees], as the priest['s] employers, were potentially liable for that abuse." (*quoting Kelly v. Marcantonio,* 187 F.3d 192, 201 (1st Cir.1999))).

■ ¶ 19 Finally, we turn to Appellant's assertion that the statute of limitations concerning his claim against Appellees is tolled by the Servicemembers Civil Relief Act (hereinafter "SCRA"[4]), which states in pertinent part:

> The period of a servicemember's military service may not be included in computing any period limited by law, regulation or order for the bringing of any action or proceeding in a Court, or in any board, bureau, commission, department or other agency of a state (or political subdivision of a state) or the United States by or against the servicemember or the servicemember's heirs, executors, administrators, or assigns.

50 App. U.S.C.A. § 526(a). According to 50 App. U.S.C.A. § 511(2)(A)(i), the SCRA defines "military service" as a servicemember who is on "active duty."

> The term "active duty" means full-time duty in the active military service of the United States. Such term includes full-time training duty, annual training duty, and attendance, while in the active military service, at a school designated as a service school by law or by the Secretary of the military department concerned. Such term does not include full-time National Guard duty.

10 U.S.C.A. § 101(d)(1).

¶ 20 Appellant claims that on July 1, 1982, he "enlisted in the military and continuously remained and still remains in the military service." Complaint, 1/06, ¶ 103.

---

4. The SCRA was previously named the Soldiers' and Sailors' Civil Relief Act before it was amended in December of 2003.

July 1, 1982, is nine days less than two years after the end of the sexual abuse on July 10, 1980, which is the date an anonymous letter was received by Appellant's parents triggering the cessation of the abuses by Father Leneweaver. *Id.* at ¶ 40. Appellant avers that by virtue of his military service, the tolling provision of the SCRA applies and permits the filing of his complaint over twenty-five years after the last act of abuse. We think not.

¶ 21 To elaborate, Appellant's allegation that he "enlisted" in the military on July 1, 1982, does not come within the parameters of SCRA's definition of "period of military service," which is defined as follows:

The term "period of military service" means the period beginning on the date on which a servicemember enters military service and ending on the date on which the servicemember is released from military service or dies while in military service.

50 App. U.S.C.A. § 511(3). The term "military service" is defined by the SCRA thusly:

(2) Military service

The term "military service" means—

(A) in the case of a servicemember who is a member of the Army, Navy, Air Force, Marine Corp., or Coast Guard—

(i) active duty, as defined in section 101(d)(1) of title 10, United States Code, and

(ii) in the case of a member of the National Guard, includes service under a call to active service authorized by the President or the Secretary of Defense for a period of more than 30 consecutive days under section 502(f) of title 32, United States Code, for purposes of responding to a national emergency declared by the President and supported by Federal funds;

(B) in the case of a servicemember who is a commissioned officer of the Public Health Service or the National Oceanic and Atmospheric Administration, active service; and

(C) any period during which a servicemember is absent from duty on account of sickness, wounds, leave, or other lawful cause.

50 App. U.S.C.A. § 511(2)(A)-(C).

¶ 22 The provisions of the SCRA are to be "liberally construed" and applied in a broad spirit of gratitude towards service personnel. *Engstrom v. First National Bank of Eagle Lake,* 47 F.3d 1459, 1462 (5th Cir.1995); *Omega Industries, Inc. v. Raffaele,* 894 F.Supp. 1425, 1434 (D.Nev.1995). Because of this, the Court "must exercise extreme caution in withholding the protection" of the SCRA. *Omega Industries, Inc.,* 894 F.Supp. at 1434. Nevertheless, the Court must give "equitable consideration of the rights of parties to the end that their respective interests may be properly conserved." *Engstrom,* 47 F.3d at 1462.

¶ 23 Appellant takes the position that the trial court erred in holding that a servicemember must be engaged in "active service" in order to avail himself of the protections of the SCRA's tolling provisions. *See* Trial court opinion, 10/6/06, at 12. The term "military service" as defined by Section 511(2)(C), argues Appellant, also includes "any period in which a servicemember is absent from duty on account of [ . . . ] other lawful cause." Appellant concedes having periods of inactive duty since he enlisted in the Navy on July 1, 1982, but contends they were also periods during which he "was absent from duty on account of [ . . . ] other lawful causes [ . . . ]" under the definition of "military service." Thus, because he had a lawful cause for his absence from duty,

Appellant claims that the entire period from the date of his enlistment on July 1, 1982, to the present qualifies as "military service" for purposes of his "period of military service" under Section 511(2)(C) and renders applicable the tolling provision of the SCRA. *See* Appellant's brief, at 32.

¶ 24 The short answer to Appellant's argument is that nowhere does the SCRA provide that its tolling protections are triggered by "enlisting." Instead, the SCRA expressly points to "active duty" as the touchstone activating its tolling provisions. *See* 50 App. U.S.C.A. § 511(2)(A)(i), (3); 10 U.S.C.A. § 101(d)(1); *see also Hunt v. United Auto Workers Local 1762, et al.,* 2006 WL 572805, *1, 2006 U.S. Dist. LEXIS 12673, *2 (E.D.Ark.2006) (The Soldiers' and Sailors' Civil Relief Act (predecessor to the SCRA) entitles a member of the armed forces to a stay of legal proceedings to which he is a party while he is on active duty; as the trial court found that plaintiff's rights in the litigation would not be protected during his active deployment, a stay was indeed warranted); *In Re: Watson,* 292 B.R. 441, 443 (Bankr.S.D.Ga.2003) ("members of the Reserve, National Guard or Air National Guard components who are not on active duty are not covered by the [Soldiers' and Sailors' Civil Relief Act ("SSCRA");] [ . . . ] to be covered under the SSCRA the soldier needs to be on federal active duty[;] it's protective provisions are applicable to all military personnel on active duty [ . . . ]." (citations omitted)); *Detweiler v. Pena,* 38 F.3d 591 (D.C.Cir.1994) (The SSCRA is permitted to toll the limitations period of the Coast Guard Board for the Correction of Military Records ("BCMR") during a servicemember's period of active service. "The BCMR's three-year time limit would re-main in effect for all cases where the individual was not in active service during the period from the discovery of the error to the filing of the petition [ . . . ]."). There are gaps in Appellant's active duty status, which classifies him as inactive from 7/1/82 through 1/31/83, 8/7/83 through 2/1/86, and again from 2/15/86 through 11/27/86. *See* Appellees' "Motion for Summary Judgment," Exhibit B. As a result, because Appellant has undisputed periods of inactive duty, the tolling provision of the SCRA would not apply to those dates.

¶ 25 To the extent that Appellant attempts to circumvent the barring effect of his "inactive" duty to the tolling provisions of the SCRA by arguing that he had a lawful cause for being absent from duty, the same has no factual support in the record. Appellant chose to present no evidence on the issue, save for a one sentence statement that he "enlisted" in the military on July 1, 1982. *Cf. Davenport v. Richards,* 2006 WL 3791369, *1, 2006 U.S. Dist. LEXIS 82238, *2 (W.D.Wash.2006) ("On June 12, 2006, defendant Avenson telephoned state defendants' counsel 'from his pre-deployment training station in Mississippi,' and informed him that 'he was on active duty in the United States Navy and that he would deploy on June 23, 2006 to the Middle East for military police duties.' [ . . . ] Defendant Avenson further told state defendants' counsel that 'his deployment would last 12 to 18 months and would possibly include Iraq.' [ . . . ] Defendant Avenson also has submitted a declaration, in which he confirmed the above information regarding his military status, training, assignment and potential length of deployment, as set forth in the declaration of state defendants' counsel."). Even on appeal, Appellant neglects to fill this void in the record. *See* Appellant's brief, at 32.[5]

---

**5.** In particular, Appellant alleges that the periods of inactive duty are also periods during which he was absent from duty on account of "other lawful cause," and cites to the repro-

¶ 26 The United States Supreme Court has made clear that Congressional intent in passing the SCRA was "to protect all military personnel on active duty, just as the statutory language provides." *Conroy v. Aniskoff,* 507 U.S. 511, 515, 113 S.Ct. 1562, 123 L.Ed.2d 229 (1993). Appellant does nothing to address his periods of inactive duty or the SCRA's clear intent to protect those in active service. *Detweiler,* 38 F.3d at 593 (The plain meaning of the tolling provision of the SSCRA is "unambiguous, unequivocal, and unlimited," and suspends for the duration of military service the running of time in which title to property can be redeemed under state law. (citation omitted)). Accordingly, finding no merit to any of Appellant's claims, we shall affirm the entry of summary judgment.

¶ 27 Judgment affirmed.

duced record at 92a–94a to buttress this argument. We have reviewed the above-referenced pages of the reproduced record and find no elucidation by Appellant as to what "other lawful cause" he had for being on inactive duty status.